[Civ. No. 13165.   Second Dist., Div. One.   May 28, 1942.]

A. CAMINETTI, JR., as Insurance Commissioner, etc., Respondent, v. STATE MUTUAL LIFE INSURANCE COMPANY (a Corporation), Appellant.

Sherman & Sherman, Robert W. Kenny, Morris E. Cohn and W. B. Thomas for Appellant.

Earl Warren, Attorney General, and John L. Nourse, Deputy Attorney General, for Respondent.

DRAPEAU, J. pro tem.—The Insurance Commissioner of the State of California, upon an ex parte application to the superior court, secured an order vesting title in him, in

his official capacity, to all of the assets of State Mutual Life Insurance Company, a California insurance corporation. Pursuant to said order, the commissioner took possession of the books, records, property and assets of the company, and proceeded to conduct its business as conservator. (Ins. Code, § 1011.) State Mutual Life Insurance Company is a mutual insurance company as defined by chapter 9 of the Insurance Code. (Ins. Code, §§ 10810-10940.)

The principal reason alleged by the commissioner for the take-over was that $1,000 a month salary paid to the executive vice-president of this insurance company was so disproportionate to the value of the services rendered by him, and to the income of the company, that further transaction of its business would be hazardous to its policyholders and the public. (Ins. Code, § 1011.)

The Insurance Code provides in cases of this kind that the ex parte order shall continue in force and effect until it shall appear to the court that the cause for granting said order does not exist or has been removed "and that said person can properly resume title and possession of its property and the conduct of its business." (Ins. Code, § 1012.)

The insurance company filed its notice of motion to set aside the order, and also filed an answer to the commissioner's application therefor; and the matter came on regularly for hearing. The superior court made its order denying the motion. From this order the company has appealed.

An example to illustrate the operations of any general type of business must of necessity be incomplete. To include within it all of the things in detail which go to make up the business, and then to attempt to distinguish between different variants which occur in the conduct of the business generally, makes the example too long and destroys its purpose—which is merely illustrative. With the understanding that it does not contain all of the elements which go to make up every company, stripped of technical distinctions and niceties, and in order to illustrate in part the functions of a mutual insurance company, an example would be as follows: Ten individuals each pay a premium of $1.00 a month for the purpose of insuring themselves against loss by accident, or ill health, or death, or other casualty. From this premium money, and based on averages used for insurance purposes, these persons build up a fund to pay losses caused by the hazards insured against. Ordinarily they are called "policyholders." From year to year part of the premium money is paid out

for losses; part of it goes into reserves for future losses; part of it is spent for necessary expenses of conducting their mutual business.

At this point there is to be considered what might be termed the eleventh man. He is the manager of the mutual business, which is generally carried on through the instrumentality of a non-profit corporation. The manager secures from the policyholders proxies authorizing him to represent them at stockholders' meetings; he votes these proxies for corporate directors subservient to him, thereby assuring to himself complete control of the business and its operations. He has no money of his own invested in the company, except possibly a mutual policyholder's interest, of negligible amount compared with the total investment of the other members. By his representation of the policyholders as their proxy, and by his assumption of the conduct of their mutual business, his relation as to them is a fiduciary one. He owes to the mutual policyholders exact honesty in all of his dealings with their money. As to them he is bound to act in good conscience and in good faith, having due regard for their interests at all times. He may not cause to be paid to himself any of the policyholders' money that is not fairly, justly and equitably due to him, considering the size of the company and the nature of the services which he renders.

In the case at bar there were, of course, many more than ten policyholders, with but one manager. But the principles involved in the example given are applicable no matter how many members make up the money.

The Insurance Commissioner concluded after an examination, and the court determined after a hearing, that $1,000 a month taken from the funds of State Mutual Life Insurance Company and paid to its executive vice-president was hazardous as far as the company was concerned, and was a breach of the fiduciary relation which the manager sustained to the mutual members whom he represented.

There is in the record support for the argument of counsel for appellant that when the executive vice-president took over this company it was in bad financial condition; that by his work and efforts and managerial ability the company's financial condition changed year by year for the better; that for a considerable period at the beginning of his management he took no salary whatever; that an average of his monthly salary for all the time of his management was much less than

$1,000 per month; and that the company was at all times solvent.

There is also in the record substantial evidence to support the conclusion of the trial court, which then, as a matter of law, requires this court to affirm the judgment. (*Dreyer* v. *Cole,* 210 Cal. 339 [292 Pac. 123] ; *Ray* v. *Kennedy,* 24 Cal. App. (2d) 583 [76 P. (2d) 147] ; *Miller* v. *Pacific Freight Lines,* 40 Cal. App. (2d) 451, 453 [104 P. (2d) 1069] ; *Kern Valley Bank* v. *Koehn,* 10 Cal. App. 679, 681 [103 Pac. 173].)

The proxies by which the executive vice-president controlled this company were secured when insurance policies were delivered to the mutual members. At that time there was presented to each member a document bearing in boldface type "please sign and return this policy receipt immediately." Following a clause receipting for the policy, there was an additional provision by which the manager, or his nominee, was named proxy to vote at all meetings of the policyholders for a period of seven years.

Most of the business of the company was sickness and accident insurance. In 1939 the cost of operation of the accident and health department consumed 77 per cent of the total income of that department. In the first six months of 1940 more than 73 per cent of the total income of the accident and health department was spent for operating expenses, which operating expenses included $1,000 a month salary paid to the executive vice-president. Moreover, it appeared that this same individual received a salary of $30,000 a year from another mutual insurance company of which he was president, and over which he exercised control by reason of the trust and confidence reposed in him by the mutual members thereof.

There is a duty committed to the Insurance Commissioner by the people of the State of California to protect the rights of all insurance policyholders. It is settled law of California that the business of insurance is one affected with a public interest. (*Carpenter* v. *Pacific Mutual Life Ins. Co.,* 10 Cal. (2d) 307, 329 [74 P. (2d) 761].)

As was said in *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389 [34 S. Ct. 612, 58 L. Ed. 1011, 1023, L. R. A. 1915C, 1189] : "To the contention that the business is private we have opposed the conception of the public interest. We have shown that the business of insurance has very definite characteristics, with a reach of influence and consequence beyond and different from that of the ordinary businesses of the commercial world, to pursue which a greater liberty may be as-

serted. The transactions of the latter are independent and individual, terminating in their effect with the instances. The contracts of insurance may be said to be interdependent. They cannot be regarded singly, or isolatedly, and the effect of their relation is to create a fund of assurance and credit, the companies becoming the depositories of the money of the insured, possessing great power thereby, and charged with great responsibility.''

And dealing specifically with the subject of mutual insurance and its regulation by the state is to be found the following significant language by the Supreme Court of the State of Ohio in the case of *State* ex rel. *National Mut. Ins. Co.* v. *Conn.*, 117 Ohio St. 190 [157 N. E. 563, 566] : ''Mutual insurance has acquired a status of usefulness and a reputation for service in the insurance world. It has the sanction of legislation and has resulted in the majority of instances in reducing the cost of insurance. It has resulted in a multitude of other instances in disaster to persons who believed their risks were conservatively covered. Between these extremes of experiences, it has become established that governmental safeguards are imperative. The superintendent of insurance is by statute made the guardian and the conservator of the rights of the multitude of insured, whose interests are large in the aggregate, but whose separate and individual rights are of too small value to warrant any expensive efforts toward investigation or redress.''

In the present case a review of the testimony before the trial court discloses not only that there was substantial evidence upon which the order was made, but that it was the duty of the insurance commissioner to take over this insurance company.

There is no merit in the further contentions presented on this appeal: that the application of the commissioner for the ex parte order is deficient; that the court was without jurisdiction to make the order; and that the proceeding as a whole is based upon an unconstitutional statute. They are all covered by and disposed of, either directly or by analogy, in the Pacific Mutual cases. (*Carpenter* v. *Pacific Mutual Life Insurance Co.*, 10 Cal. (2d) 307 [74 P. (2d) 761] ; *Neblett* v. *Carpenter*, 305 U. S. 297 [59 S. Ct. 170, 83 L. Ed. 182] ; *Carpenter* v. *Pacific Mutual Life Insurance Co.*, 13 Cal. (2d) 306 [89 P. (2d) 637].)

■ Appellant presents the further argument that the state

is estopped from taking over this insurance company because the commissioner and his predecessors in office knew of the practices which the commissioner determined, and the court in this proceeding concluded, to be hazardous; that, knowing of these practices in years gone by, the commissioner failed to take over the company and permitted it to continue its business.

To state the contention is to state its impossibility. To govern themselves, the people act through their instrumentality which we call the State of California. The State of California functions through persons who are for the time being its officers. The failure of any of these persons to enforce any law may never estop the people to enforce that law either then or at any future time. It would be as logical to argue that the people may not proceed to convict a defendant of burglary because the sheriff perhaps saw him and failed to stop him or arrest him for another burglary committed the night before. (*State* ex rel. *Fishback* v. *Glove Casket & Undertaking Co.*, 82 Wash. 124 [143 Pac. 878, L.R.A. 1915B, 976]; *Department of Insurance* v. *Church Members R. Assn.*, 217 Ind. 58 [26 N. E. (2d) 51, 52]; *Mullan* v. *State*, 114 Cal. 578, 587 [46 Pac. 670, 34 L.R.A. 262].)

The order denying the motion to vacate the order appointing a conservator, is affirmed.

York, P. J., and Doran, J., concurred.