137 Cal.App.2d 87 (1955)
290 P.2d 20
MARKET STREET RAILWAY COMPANY (a Corporation), Appellant,
v.
CALIFORNIA STATE BOARD OF EQUALIZATION, Respondent.
Docket No. 16359.
Court of Appeals of California, First District, Division One.
November 18, 1955.
*90 Keith, Creede & Sedgwick, Frank J. Creede and John S. Howell for Appellant.
Edmund G. Brown, Attorney General, James E. Sabine, Assistant Attorney General, Ernest P. Goodman and Sho Sato, Deputy Attorneys General, for Respondent.
PETERS, P.J.
Market Street Railway Company, hereafter referred to as Market, paid under protest, sales taxes, together with interest and penalty, assessed against it for the period August 1, 1933, to December 31, 1948, in the amount of $111,359.36, and then brought this action to recover this payment.[*] During the trial it was stipulated that the taxes in part had been erroneously assessed against the sale of real property, and that, in any event, Market should recover $21,325.39, with interest. Judgment in that sum was entered in favor of Market. From that judgment Market appeals, contending that no portion of the amount paid by it under protest should have been assessed.
The State Board of Equalization found that between 1933 and 1948 Market, in some 900 transactions, had sold tangible personal property subject to the tax valued at $2,987,434.38. Of this amount, $2,891,578.83 represented the value of tangible personal property transferred by Market to San Francisco on September 29, 1944, when it sold its operative properties to the city. This is the major item involved on this appeal.
The facts are as follows: Market is a California corporation first organized in 1893. From then, in various corporate forms, until 5 p.m. on September 29, 1944, it was a public service corporation operating in San Francisco and San Mateo Counties.
As early as 1912 it was the expressed desire of San Francisco to own and operate all of the street railways in the city. The Charter of 1932, in section 119, expresses this purpose in the following language: "It is the declared purpose *91 and intention of the people of the city and county, when public interest and necessity demand, that public utilities shall be gradually acquired and ultimately owned by the city and county."
The efforts of the city to acquire Market became very direct in 1940. For four years thereafter the city tried to negotiate the purchase. In November of 1942, and again in April of 1943, charter amendments authorizing the purchase for $7,950,000 were submitted to the voters and defeated. Finally on May 16, 1944, the voters approved the addition of section 119.1 to the charter providing for the purchase of Market's operative properties for $7,500,000. Market and the city, on September 14, 1944, entered into a contract, approved by the Railroad Commission, to convey these properties to the city, and a deed was executed making the transfer effective as of 5 p.m. September 29, 1944. At that moment Market ceased its operations and commenced winding up its affairs, liquidating the claims against it and disposing of its nonoperative properties, both real and personal.
The trial court found that the sale was "the result of voluntary and willing negotiations" between the parties. This finding is supported. Although the evidence shows that Market was apprehensive after 1932, when section 119 of the charter was enacted, about the possibility of eminent domain proceedings being instituted against it, and that such apprehension became more acute when section 119.1 was enacted in 1944, the evidence also shows that beginning in 1942 the company was willing and desirous to negotiate a sale because of steadily declining revenues, increasing expenses, competition, poor financing and possible bankruptcy.
The trial court also found that for many years prior to October 1, 1944, there was in existence an interpretative ruling of the State Board of Equalization, number 63, which provided:
"The tax does not apply to any portion of the consideration paid in connection with the sale of an entire business; that is, equipment, fixtures, and so forth...." But on October 1, 1944, two days after the effective date of the sale, the state board revised Ruling 63 to read as follows: "The tax applies to that portion of the gross receipts from the sale of an entire business operated by a retailer that represents the fair retail value of the tangible personal property, such as show cases and office or delivery equipment, acquired for use rather than resale by the purchaser of the business. The tax *92 does not apply, however, with respect to tangible personal property such as stock in trade, sold for the purpose of resale in the regular course of the purchaser's business."
The evidence shows that just prior to the sale the legal department of Market had made an analysis of the taxes involved in the transaction and had come to the conclusion that no sales tax was applicable. The trial court found that Market relied upon Ruling 63 as it read prior to October 1, 1944 "but said ruling did not cause plaintiff to change its position or course of conduct with regard to said sale," and further that "Reliance by plaintiff on interpretative Ruling 63 ... did not result in any prejudice to plaintiff."
On December 29, 1944, Market became aware for the first time of the amendment to Ruling 63, and the chief counsel and vice president of the company advised it that since the ruling did not become effective until October 1, 1944, it was not applicable to the sale.
In 1948, some four years after the sale to the city, the state board, in auditing the books of another company, discovered sales to that company by Market of some of its nonoperative property. An audit of Market's books was then made. This audit disclosed that Market had never paid any sales taxes nor had it ever filed a return, although between 1933 and December of 1948 it made about 900 sales of tangible personal property not for resale by the buyer, totalling, not including the sale to the city, about $100,000. Prior to the sale to the city these sales consisted mainly of sales of scrap material such as used or surplus ties and rails, sales made for the accommodation of employees, and several sales of rock from a rock quarry operated by Market. Prior to the sale to the city these sales amounted to 11/100 of 1 per cent of the gross operating revenue of Market. After the sale of the operative properties to the city the sales were of nonoperative personalty. In the sale to the city the state board determined that the tangible personal property involved was valued at $2,891,578.83. Market contested some of the items on the ground that some of the articles were fixtures, and during trial the parties stipulated that Market should recover $21,325.39 of the $111,359.36 tax assessed against and paid by it. This amount was computed as follows:

 Tax .............................. $ 75,065.54
 Interest ......................... 28,787.27
 Penalty .......................... 7,506.55
 ___________
 Total ............................ $111,359.36

*93 The trial court determined that Market was a retailer, that all of the sales of tangible personal property not for resale were taxable, and entered judgment for Market in the stipulated amount of the overcharge  $21,325.39. Market appeals.
The first basic question involved is whether the sale of all of the operating properties of Market, insofar as it involved a transfer of tangible personal property not for resale by the buyer, in September of 1944, was taxable under the Sales and Use Tax Law of this state. The parties discuss the problem from several standpoints, and quote from and rely upon authorities from many states, but the problem is basically one of interpreting the applicable California statutes.
The Sales and Use Tax Act is found in the Revenue and Taxation Code, sections 6001 to 7176. As of September 29, 1944, the applicable sections read as follows:
Section 6051: "For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers at the rate of 2 1/2 per cent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail in this State...."
Section 6007: "A `retail sale' or `sale at retail' means a sale for any purpose other than resale in the regular course of business in the form of tangible personal property."
Section 6013: "`Business' includes any activity engaged in by any person or caused to be engaged in by him with the object of gain, benefit, or advantage, either direct or indirect."
Section 6015: "`Retailer' includes: (a) Every person engaged in the business of making sales at retail ... of tangible personal property...."
Section 6052: "The tax hereby imposed shall be collected by the retailer from the consumer insofar as it can be done."
[1] In the interpretation of those tax statutes Market correctly points out that all reasonable doubts must be resolved in favor of the taxpayer. (County of Los Angeles v. Jones, 13 Cal.2d 554 [90 P.2d 802]; Barker Bros., Inc. v. Los Angeles, 10 Cal.2d 603 [76 P.2d 97].) But there is no real doubt as to what the quoted statutes provide. [2] Even interpreted most strictly against the state, they clearly make the transactions here involved "retail sales," and make Market a "retailer." [3] Section 6007 defines a sale at retail as a "sale for any purpose other than resale in the regular course of business." Clearly, Market engaged in sales at retail to a buyer who purchased not for resale in the regular course of his business. The only way an ambiguity can be created *94 in the quoted phrase is by interpreting the phrase "in the regular course of business" as referring to "sale," i.e., the seller, and not to "resale," i.e., the buyer. But the section neither grammatically nor reasonably so provides. Obviously, the words "in the regular course of business" refer to and limit the word "resale" rather than the word "sale."
If any support were needed for such an obvious construction it is to be found in the fact that the phrase "in the regular course of business" was added to section 6007 in 1941 at the same time that sections 6091 to 6094 were amended to explain the meaning of the phrase. In these other sections the context, without possibility of a doubt, demonstrates that the phrase refers to the buyer and not to the seller.
[4] As might be expected, all of the California cases involving the general question have held that the sale to be taxable does not have to occur in the regular course of business of the seller. In Bigsby v. Johnson, 18 Cal.2d 860 [118 P.2d 289], the taxpayer owned and operated a printing establishment. His regular course of business was the sale of printed matter. He sold some printing equipment that had become obsolete. The board held the transaction taxable, and the Supreme Court affirmed, rejecting the taxpayer's contention that the sale was casual, incidental, not in the regular course of business, and therefore not taxable. At page 862 the court stated: "The tax is imposed upon retailers for the privilege of doing a retail sales business..., and the measure of the tax is the gross receipts of any such retailer from the sale of `all tangible personal property sold at retail....' ... He can claim no exemption merely by virtue of the fact that the sale of used printing equipment was not the kind of retail sale ordinarily made by him ... however forceful may be plaintiff's contention that this type of sale should be exempted from the operation of the statute, such arguments must be directed to the legislature rather than to the courts." (Italics added.)
Likewise, in Northwestern Pac. R. Co. v. State Board of Equalization, 21 Cal.2d 524 [133 P.2d 400], the Supreme Court, as one of the grounds of its opinion, held that casual sales of its rolling stock by the company were taxable.
There can be no doubt, therefore, that the 900 separate transactions, including the sale to the city, were clearly "retail" sales.
Market next claims that it was not a "retailer" within the meaning of section 6015, subdivision (a), which defines *95 a "retailer" as "Every person engaged in the business of making sales at retail." In the preceding paragraphs it has been demonstrated that the sales here involved were at retail, so that the only question to be determined is whether Market was in the "business" of making such sales. Section 6013 defines "business" to include "any activity engaged in by any person or caused to be engaged in by him with the object of gain, benefit, or advantage, either direct or indirect."
The courts in interpreting this section leave no doubt that Market was in the "business" of making sales at retail.
In Los Angeles etc. Sch. Dist. v. State Board of Equalization, 71 Cal. App.2d 486 [163 P.2d 45], it was held that a school board was engaged in "business" as a "retailer" because it made two or three sales of used equipment quarterly. The court held, at page 488: "... the term `business' is not used in the commercial sense attributed to it by appellants but must be interpreted in the light of the statutory definition set forth in the act." (See also People v. County of Imperial, 76 Cal. App.2d 572 [173 P.2d 352]; City of Los Angeles v. Lewis, 175 Cal. 777 [167 P. 390]; Marin Municipal Water Dist. v. Chenu, 188 Cal. 734 [207 P. 251].)
[5] It is not required that the sales be made with the intention of making a profit. Thus, in Union League Club v. Johnson, 18 Cal.2d 275 [115 P.2d 425], the sales from the operation of a dining room and bar were held taxable despite the fact that the vendor was a nonprofit corporation and the activities were carried on at a loss. The criterion expressed in the statute is "gain, benefit, or advantage," not "profit."
[6] Undoubtedly the term "business" requires that the seller engage in more than one isolated sale. The number, scope, and character of the transfers must be considered. (Northwestern Pac. R. Co. v. State Board of Equalization, 21 Cal.2d 524 [133 P.2d 400].) In that case the Supreme Court held that the railroad was in "business" by virtue of one sale of 13 coaches in 1936, a single sale of 2 coaches and a baggage car in 1936, a sale of a truck and trailer, of 20 flat cars and a locomotive in 1937. The total sales approximated $100,000. In the Los Angeles etc. Sch. Dist. v. State Board of Equalization case, 71 Cal. App.2d 486 [163 P.2d 45], the district's transfers were held taxable although they amounted to but two or three quarterly.
[7] Thus, the term "retailer" includes a seller whose main occupation is not the making of retail sales. The enterprise does not even have to be a commercial one. The test *96 is whether there are sufficient sales of tangible personal property sold to a buyer not for resale in the regular course of the buyer's business. In the instant case, from 1933 to 1944 Market made 900 retail sales which, not including the sale to the city, amounted to about $100,000. Under the statute, as interpreted by the cases, this demonstrates the correctness of the finding that Market is a "retailer" within the meaning of the act.[**]
[8] Market contends that it, as a matter of law, could not be a retailer, because, as a service corporation, it was a "consumer" and not a "retailer." It is true that Ruling 1901 provides that persons "engaged in business of `rendering service' are consumers not retailers of personal property which they use in rendering service. Hence they must pay tax on the property sold to them." But that ruling only applies to operations in connection with the company's service to the public. Obviously, a person or company can be either a consumer or a retailer, or can be both. As to tangible personal property that it sells, it is a retailer. This was what was necessarily held in Northwestern Pac. R. Co. v. State Board of Equalization, 21 Cal.2d 524 [133 P.2d 400]. The rule of that case is here applicable.
Market next argues that regardless of the taxability of the transfers made before the sale to the city of the operating properties of the company, that sale was not taxable under the statute. This problem does not seem to have been passed on directly by the California courts.
The main thesis of Market is that liquidation sales were never intended to be within the scope of the act  that the sales tax is imposed on the privilege of engaging in business, not on the privilege of going out of business.
The answer to this problem must be sought in the terms of the statute. [9] Exemptions from taxation must be found in the statute. It is not for the courts to say that, although the statute applies to all sales of tangible personal property by a retailer, not sold for resale by the buyer, the statute does not apply to this sale by a retailer because of some undisclosed general "intent."
In the instant case, the statute, as it read in 1944, clearly applied to the sale to the city of that portion of the operating *97 assets consisting of tangible personal property. As already pointed out, section 6051 then provided: "For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers at the rate of 2 1/2 per cent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail in this State." (Italics added.) We have already demonstrated that Market was a "retailer" within the meaning of the act, and that the sale here involved was a "retail sale." This being so, it follows with almost syllogistic infallibility that this sale was taxable.
As already mentioned, Market urges that, although a liquidation sale is not expressly exempted in the statute, it simply is not such a sale as was contemplated by the Legislature when it passed the statute, because, so it is claimed, the statute is aimed at taxing the privilege of operating, conducting and maintaining a retail business, and not on the "privilege" of going out of business. To sustain this view Market refers to several cases where the point was not involved and the courts used general language to the effect that the sales tax was imposed on the privilege of "operating," "maintaining," "engaging in an occupation or business," etc. (See Roth Drug, Inc. v. Johnson, 13 Cal. App.2d 720 [57 P.2d 1022]; Western L. Co. v. State Board of Equalization, 11 Cal.2d 156 [78 P.2d 731, 117 A.L.R. 838]; National Ice etc. Co. v. Pacific Fruit Express Co., 11 Cal.2d 283 [79 P.2d 380].) These cases did not consider the point here involved. Of course a holding that the tax is imposed on the "privilege" of "operating" a business is not a holding that a sale of an entire business is exempted from the act or, in fact, is not a holding that selling out a business is not "operating" a business during that transaction. That point was neither considered nor passed on by the cited cases. They are of no help in passing on the point here involved.
Market also refers to two Georgia cases where it was held that the Georgia sales tax statute did not apply to the sale of an entire business. (Novak v. Redwine, 89 Ga. App. 755 [81 S.E.2d 222]; State v. Dyson, 89 Ga. App. 791 [81 S.E.2d 217].) The Novak case is the key case. Under a statute substantially similar to ours, that case undoubtedly held that a sale by a retail baker of his bakery business and store fixtures was not taxable, the court reasoning that the baker was not "engaged in the business" of selling the bakery and the fixtures. The rationale of the Georgia cases is that *98 the Georgia statute was not intended to apply to casual and isolated sales by retailers, but only applied to sales made in the regular course of business. In other words, the Georgia court interpreted the term "business" in its common and accepted meaning. (Novak v. Redwine, 89 Ga. App. 755 [81 S.E.2d 222, 223, 225].) But this interpretation is directly contrary to that made by the Supreme Court in Bigsby v. Johnson, 18 Cal.2d 860, 863 [118 P.2d 289], and by the appellate court in Los Angeles etc. Sch. Dist. v. State Board of Equalization, 71 Cal. App.2d 486, 488 [163 P.2d 45].) These cases have already been discussed. For this reason the Georgia cases are not persuasive.
[10] It should also be pointed out that in 1944 the California act had no exemption of casual and occasional sales. In 1947 section 6367 was amended so as to exempt occasional sales of tangible personal property from the tax. Market contends that this was a mere codification of existing law. This is not so. Clearly, these changes were intended to and did modify the definition of "business" set forth in Bigsby v. Johnson, 18 Cal.2d 860 [118 P.2d 289], and Los Angeles etc. Sch. Dist. v. State Board of Equalization, 71 Cal. App.2d 486 [163 P.2d 45].) Thus, the 1947 amendment to section 6367 is of no aid to Market.
Market also places considerable reliance on two federal Court of Appeal cases from the Ninth Circuit interpreting the California Sales Tax Act and certain federal statutes. The cases are State Board of Equalization v. Boteler, 131 F.2d 386, and California State Board of Equalization v. Goggin, 191 F.2d 726. In both cases the court ruled against the contention of the State Board of Equalization that a sales tax was applicable to a sale, by a trustee in bankruptcy, of an entire business as part of the process of liquidating that business. There is undoubtedly language in these cases that supports the contention of Market that the sales tax act is not applicable to the sale of a business. For example, in the Goggin case, supra, at page 729, the court stated: "The California Supreme Court has stated that the tax measure involved is an excise tax for the privilege of conducting a retail business, measured by the gross receipts from sales. [Citations] ... when the trustee in bankruptcy disposed of the trucks here involved `... the sale was not made in the course of conducting a business but in the process of putting an end to a business.'" In the Boteler case, supra, the federal court applied the same rule to a liquidation by *99 many sales, refusing to draw a distinction between a liquidation sale in bulk and one by the piece. This was held although the federal statute provides that trustees in bankruptcy conducting businesses are subject to all state taxes applicable to such businesses.
It is possible that these cases can be explained on the theory that the federal courts there involved felt that a trustee in bankruptcy was not a retailer because of his status under federal law. It seems most likely that the federal courts construed the term "business" in the federal statute in its ordinary commercial sense and not as the California courts have construed the term in the Sales Tax Act. At any rate, even if these cases are contrary to the views herein expressed, this court, as an intermediate state appellate court, is bound in interpreting a state statute to follow the rule laid down by the Supreme Court of this state.
It follows that both as a matter of interpretation and of binding precedent this sale was taxable.
A much more difficult question is presented by Market's contention that Ruling 63, upon which Market admittedly relied, estops the state board from collecting the tax, penalties, and interest.
As already pointed out, the state board in 1933 adopted Ruling 63, which provided that "The tax does not apply to any portion of the consideration paid in connection with the sale of an entire business; that is, equipment, fixtures, and so forth...." This ruling remained in effect until October 1, 1944, two days after the consummation of the sale. Ruling 63 was adopted pursuant to section 7051, which permits the board to "prescribe, adopt, and enforce rules and regulations relating to the administration and enforcement" of the sales tax and to "prescribe the extent to which any ruling or regulation shall be applied without retroactive effect." There is no doubt but that Market, at the time of the sale, knew of this ruling and relied upon it. The trial court so found. It is also undisputed that the sale by Market to the city had great notoriety, that at least one member of the board had actual knowledge of the sale at the time it was made, and that no tax was assessed by the board until 1949, over four years after the sale had been consummated.
The trial court found that, although Market relied on Ruling 63 (the evidence showing that counsel for the company advised the company on the basis of the rule that no tax was payable), the "ruling did not cause plaintiff to *100 change its position or course of conduct with regard to said sale." The court also found that "Reliance by plaintiff on interpretive Ruling 63 ... did not result in any prejudice to plaintiff. It is untrue that plaintiff could have added sales tax reimbursement to the $7,500,000 purchase price.... The $7,500,000 provided for in said charter amendment was the maximum amount the City and County of San Francisco was authorized to pay to plaintiff for its operative properties." The court also found that the delay in assessing the tax was not unreasonable and was caused by the failure of Market to file a sales tax return.
It is the correctness of these findings and conclusions that is attacked by Market. [11] It has frequently been stated that an estoppel will not be enforced against the government. Thus, in Boren v. State Personnel Board, 37 Cal.2d 634 [234 P.2d 981], where the board agreed to employ the plaintiff in a definite geographical area, the court (p. 643) concluded that "the authority of a public officer cannot be expanded by estoppel." (See also Whitcomb Hotel, Inc. v. California Emp. Com., 24 Cal.2d 753 [151 P.2d 233, 155 A.L.R. 405].) But the rule is not an absolute one. As was said in Baird v. City of Fresno, 97 Cal. App.2d 336, 342 [217 P.2d 681]: "Ordinarily, a governmental agency may not be estopped by the conduct of its officers and employees but there are many instances in which an equitable estoppel in fact will run against the government where justice and right require it." (See for a good discussion, Farrell v. County of Placer, 23 Cal.2d 624 [145 P.2d 570, 153 A.L.R. 323].) In Cruise v. City & County of San Francisco, 101 Cal. App.2d 558, 565 [225 P.2d 988], this court had the following comment to make: "Whether an estoppel exists against the government should be tested generally by the same rules as those applicable to private persons. The government should not be permitted to avoid liability by tactics that would never be countenanced between private parties. The government should be an example to its citizens, and by that is meant a good example and not a bad one."
None of these cases involved reliance on an erroneous administrative tax ruling. [12] The state board cites many cases from this and other jurisdictions to the effect that an estoppel based on reliance upon an erroneous construction of the statute by an administrative ruling will not lie against the government, particularly in tax matters. As a general proposition this is sound law. Obviously, a tax administrator *101 should not be permitted by an erroneous ruling to exempt a taxpayer from the obligation to pay taxes. But that is as far as the rule goes. The proper limitations on that rule were pointed out by this court in La Societe Francaise v. California Emp. Com., 56 Cal. App.2d 534 [133 P.2d 47], in which a petition for hearing was unanimously denied. In that case the Societe deducted, under the terms of the California Unemployment Insurance Act, the prescribed contributions due from its employees, and allocated its own contributions to the payment of the tax. By a formal ruling of the tax agency it was ruled that the Societe, as a charitable institution, was not subject to the tax. The Societe then, in reliance on the ruling, refunded to the employees the amount that had been deducted from their salaries, and used the money it had allocated for its share of the tax for other purposes. Two years later the tax agency reversed its ruling, this time ruling that organizations like the Societe were subject to the tax. The tax agency then sought to collect from the Societe the total tax imposed on both employer and employees, penalties and interest. It was held that, although no estoppel could apply to the portion of the tax directly due from the Societe, as to the portion of the tax due from the employees, and as to penalties and interest, the state was estopped. There are several statements in that case that are applicable here. At page 552 this court stated:
"As to such part of the tax, the burden of which the act contemplates will be borne by the employees, and which the employer `transmits' to the fund, we are of the view that the state may not belatedly hold the employer to payment where he has failed to pay, or to make the necessary deductions from his employee's wages, in reliance on an express ruling that he is not liable for the tax. As between the state and employer, the state may not in good conscience thus place on the employer a burden which the act itself did not intend that he should bear. We are further of the view that the employer cannot be held to pay interest on contributions which were not paid when due solely in reliance on the official ruling of non-liability. On the other hand, the state should not lose its right to taxes which the employer should have paid from its own funds to discharge its own tax obligations ... notwithstanding plaintiff failed to make payment when due in reliance on the erroneous ruling of non-liability."
As to that portion of the tax imposed directly on the Societe the court had the following to say (p. 553): "It is the *102 general rule that the government does not lose its revenues because of an erroneous ruling of an administrative official as to the meaning of a tax law. [Numerous citations.] An administrative regulation which is in conflict with the statute is invalid and the government is not bound thereby. [Citations.] The duty of the tax officials is to collect taxes imposed by law... it is generally no defense that taxes were not paid when due in reliance on an official ruling of non-liability. The taxpayer is deemed to act with knowledge that administrative officials cannot bind the government by their erroneous interpretation of tax statutes."
The court then went on to discuss the modern attitude of the courts in ameliorating the harsh rule that the government is not bound by the rulings of tax officials administering the tax laws, and then stated (p. 555): "It is our view that in the present case a proper regard for the protection of the interests of the government in its revenues, with recognition also of a degree of responsibility on the part of the government to a taxpayer who has relied to his prejudice on an official ruling, is achieved by requiring the taxpayer to discharge that part of the tax burden which it was contemplated it should bear by the statute imposing the tax, while relieving it from liability for the employees' contributions and interest on delayed payments. The taxpayer will pay from its own funds as much as it would have paid originally but for the erroneous administrative ruling, but it will not pay more." (See also Libby, McNeill & Libby v. Wisconsin Dept. of Taxation, 260 Wis. 551 [51 N.W.2d 796], relying heavily on the La Societe Francaise case and discussing that case at some length.)
Market argues that the sales tax is very similiar to the employee's contribution involved in the La Societe Francaise case, supra, in that the seller under the Sales Tax Act is empowered to pass the tax on to the consumer. Reliance is placed upon section 6052 of the Sales Tax Act which provides that "The tax hereby imposed shall be collected by the retailer from the consumer insofar as it can be done." (See Clary v. Basalt Rock Co., 99 Cal. App.2d 458 [222 P.2d 24].)
So far as the tax itself is concerned, it is fundamentally different from the tax involved in the La Societe Francaise case, supra, So far as the unemployment tax is concerned, the portion of the tax imposed on the employees is a tax payable by those employees, and the employer is a mere collection *103 agency. [13] But the sales tax is not a tax on the buyer, but a tax on the seller, imposed on the privilege of selling goods at retail. While the seller may pass the tax on to the buyer, the tax itself is imposed on the seller, and the payment of it is his primary obligation. The buyer has no direct obligation, so far as the state is concerned, for the payment of the tax. (Clary v. Basalt Rock Co., 99 Cal. App.2d 458 [222 P.2d 24].) In the case of Crane Co. v. Arizona State Tax Com., 63 Ariz. 426 [163 P.2d 656, 163 A.L.R. 261], the court was presented with this precise question. There, as here, a seller at retail failed to pass on the sales tax to the buyer in reliance upon an erroneous administrative regulation. The seller urged that the state was estopped, and cited the La Societe Francaise case. In discussing that case the court said (p. 662): "In that case, the California court held that where the commission had informed the employer it was not subject to the unemployment insurance tax, and for that reason it collected no tax from its employees, the commission was estopped from collecting that portion of the tax which, under the law, the employer was required to collect from employees. The employer was merely a collecting agent for that part of the tax which the act contemplated should be borne by the employees.... Here [in reference to the sales tax] the appellant is in no sense the tax collector. It is the taxpayer. True, it has the right to pass on the taxes to the purchaser, but it is not under any statutory duty to do so."
We agree with this reasoning. [14] The general rule is that the state cannot be estopped because of acts of its employees from collecting the tax from the taxpayer. If the taxpayer is a mere collection agency the state may be estopped, but not where the tax is imposed on the complaining taxpayer. The public policy behind this rule is self-evident. That is this case. So far as the tax is concerned on the sale to the city, and the taxes on the transactions both before or after the sale, there can be no estoppel.
But this reasoning does not apply to the penalty and interest. Against those items, in a proper case, there can be an estoppel. The question is whether this is such a case.
The trial court held that it was not because, so the trial court found, the taxpayer did not change its position in reliance on the erroneous ruling. This reasoning is based on the fact that although Market admittedly knew of Ruling 63, relied upon it, and was advised by its counsel that no *104 tax was payable, it suffered no detriment because it could not have passed the tax on to the city for the reason that it charged the city $7,500,000, the full amount authorized by the voters, so that there was no money from which to pay an additional sum in taxes. It is also urged that Market failed to file a return and that this was the proximate cause for the imposition of penalty and interest.
This problem, as to interest and penalties, must be divided into three parts: First, interest and penalties on sales made before September 29, 1944; interest and penalty on the sale of September 29, 1944; and interest and penalties on the sales in liquidation made between September 29, 1944, and December 31, 1948. So far as the sales made between 1933 and September 29, 1944, are concerned, a return should have been filed, the tax should have been paid, and there is no ground for an estoppel. Ruling 63 has no application, because that ruling only applied to a sale of an entire business. Therefore, the penalties and interest were properly assessed on the transactions.
[15] But a different situation exists as to the sale of September 29, 1944. Here the taxpayer was told by the state board by Ruling 63 that the transaction was not taxable. It relied on that ruling. To say that it did not change its position on such reliance because the city could only pay $7,500,000, and could not have paid the tax, is to engage in mere guesswork. Entering into the sale in the induced belief that the transaction was not taxable was a change of position as a matter of law. Would Market have entered into the sale had it known that the transaction was taxable and that it would have to pay the tax? Could the city, from other funds, have legally paid the tax? If Market had known the tax was payable, would it have insisted on the city sponsoring some form of legislation to exempt the transaction from the tax? Would such legislation have passed? These questions, of course, cannot be answered. What Market would have done, had it known that the transaction was taxable, can never be known. The reason that it cannot be known is because the state board, by its Ruling 63, made the answering of that question unnecessary and impossible. For the state board now to say that the sale would have gone through anyway is to engage in conjecture and surmise. The very fact that Market did not pay the tax because it was told it did not have to, and so did not file a return and thus incurred the penalty and liability for interest, necessarily, and, as *105 a matter of law, amounted to such a change of position as to raise the estoppel. The finding to the contrary is unsupported and against the law.
But, says the state board, Market learned of the change in the ruling made on October 1, 1944, not later than December 29, 1944, and should then have known that the change was retroactive. The contention requires but scant consideration. The state board would impose on Market the duty of knowing that original Ruling 63 was erroneous, that the October 1, 1944, ruling stated the law as it always existed, and was intended to be retroactive. After having entered into the sale on September 29, 1944, in reliance on Ruling 63 the taxpayer was under no duty in December of that year to review the law applicable to the completed sale.
[16] The knowledge gained on December 29, 1944, however, is of some significance. After the sale and up until December 31, 1948, Market engaged in several transfers of tangible personal property in the liquidation of its nonoperative properties. Market is liable for the tax on these transactions. So far as penalties and interest are concerned, since these were liquidation sales, penalties and interest on the sales made between September 29, 1944, and December 29, 1944, cannot be collected. The estoppel as to similar penalties and interest as to the sale itself applies equally to these transactions, and for the same reasons. But as to the sales after December 29, 1944 (the date Market became aware of the new ruling as to liquidation sales), and December 31, 1948, no reason for an estoppel exists. After knowledge of the new ruling there could not, as to future transactions, be any estoppel.
It is obvious that the judgment must be reversed to permit the somewhat complex accounting that will be required. The trial court is directed to take such an accounting in accordance with the views herein expressed. For the guidance of the trial court the following is a summary of such views:
1. Market is liable for the tax on all sales made by it of tangible personal property sold to buyers not for resale between August 1, 1933, and December 31, 1948. This includes the tax on the portion of the sale price to the city that represents the sale of tangible personal property.
2. Market is liable for penalties and interest on all sales of such property made by it between August 1, 1933, and September 29, 1944.
*106 3. The state board is estopped from collecting penalties and interest for failure to pay the tax on the sale to the city, and is also estopped from imposing penalties and interest for failure to pay the tax on liquidation sales of nonoperative personal property made between September 29, 1944, and December 29, 1944.
4. Penalties and interest for failure to pay taxes on liquidation sales of personalty made between December 29, 1944, and December 31, 1948, are collectible by the state.
The judgment is reversed with directions to the trial court to take the accounting and enter its judgment in accordance with the views herein expressed.
Bray, J., and Wood (Fred B.), J., concurred.
NOTES
[*] No question of the statute of limitations is involved. Admittedly Market failed to file a sales tax return between 1933 and 1948. Prior to 1951 it was the law that where the taxpayer failed to file a return the statute of limitations did not start to run until the assessment made by the tax authorities became final. (People v. West Publishing Co., 35 Cal.2d 80, 86 [216 P.2d 441].) In 1951 this rule was changed by an amendment to section 6487 of the Revenue and Taxation Code. (Stats. 1951, p. 2638, chap. 1007.) Here the assessment was made in 1949 before the effective date of the nonretroactive amendment. Therefore, the assessment here involved is not affected by any statute of limitations, and Market does not contend to the contrary.
[**] This construction of "doing business" is consistent with the interpretation of that phrase as it is used in other California tax statutes. (See Hise v. McColgan, 24 Cal.2d 147, particularly at p. 150 [148 P.2d 616].)