[L. A. No. 23712.   In Bank.   Nov. 30, 1956.]

UNITED STATES FIDELITY AND GUARANTY COMPANY (a Corporation), Respondent, v. STATE BOARD OF EQUALIZATION et al., Appellants.

[L. A. No. 23713.   In Bank.   Nov. 30, 1956.]

NORTHWEST CASUALTY COMPANY (a Corporation), Respondent, v. STATE BOARD OF EQUALIZATION et al., Appellants.

[L. A. No. 23714.   In Bank.   Nov. 30, 1956.]

NATIONAL AUTOMOBILE AND CASUALTY INSURANCE COMPANY (a Corporation), Respondent, v. STATE BOARD OF EQUALIZATION et al., Appellants.

Edmund G. Brown, Attorney General, James E. Sabine, Assistant Attorney General, and Harold B. Haas, Deputy Attorney General, for Appellants.

Latham & Watkins, Dana Latham and Charles E. Horning, Jr., for Respondents.

CARTER, J.—Defendants, the State Board of Equalization and others, appeal from judgments for plaintiffs, insurance

companies, in their actions to recover taxes on their gross premiums paid under protest, together with interest on the sums.

It was stipulated that the method of conducting the bail bond business (it is a tax on premiums for such bonds which are here involved) by plaintiff companies and their agents was substantially as follows: "P, a prisoner, contacts B, a bail agent, to secure his release from jail. If B holds a bail permittee license he first decides whether to post cash bail or a bail bond. Assuming that he decides to post a bond, he has P make out an application for a bond in the penal sum of P's bail. B undertakes, for a fee, to secure the release of P on bail. Assuming that P's bail is set at $1,000, the total amount charged by B will ordinarily (but not necessarily) be $100. P pays B $100 and is given a Receipt and Statement of Charges (see Exhibit 'I') carrying a breakdown as follows:

"Bail Bond Premium................ $_____
"Fee for Arranging Bond........... $_____
       "Total Charges ................ $_____

Upon instructions of G, the general agent, B will insert the sum of $20 opposite the item 'Bail Bond Premium,' and $100 opposite the item 'Total Charges.' It is stipulated that these were G's instructions to B, but it is not clearly established that more than 75 per cent of the receipts were so broken down. B, having satisfied himself that the security offered by P is in all respects sufficient, posts a surety bail bond in the penal sum of $1,000 and secures the release of P from jail. At the end of the week during which this transaction was carried out, B reports to G, the general agent or supervising agent, of the surety company. B pays to G a consideration for the bond determined by the contractual arrangement between B and G. At the same time B deposits with G an additional sum as a 'reserve' to cover possible losses on the bond. G then reports to S, the surety company, the total face amount of all bonds written during the period covered by the report and pays to S an agreed amount. G may also deposit an additional sum as a 'reserve' to cover possible losses on this and other bonds. S reports the sum of $20 or a portion thereof (there being no uniformity) as gross premiums received on account of this bond in its annual statement and in its premium tax return to the Insurance Commissioner." The taxes which were paid under protest and awarded by the judgments were on the amounts paid to and retained by the insurance companies' agents who solicited and obtained takers of bail bonds. There

is no question about the amount actually received by the companies from the agents as that was included in the gross premiums reported by the companies and on which taxes were paid. This method of operation is substantially the same as that set forth in *Groves* v. *City of Los Angeles,* 40 Cal.2d 751, 754 [256 P.2d 309], where we held that the entire amount that was paid by the applicant to the bail agent for a bail bond was the premium, hence was gross premium received by the companies which was taxed by the Constitution (Cal. Const., art. XIII, § 14⅘) ; this was held to be true even though the companies' bail agent retained a large percentage of the amount for his profit and operation expenses. It is not questioned that the Constitution levies taxes on the entire amount but heretofore the state has been collecting taxes on only the amount actually received by the companies.

Plaintiff companies contend that, as held by the trial court, the state is estopped to collect taxes on those premiums for the past years, 1947 in the instant cases. Defendants contend there can be no estoppel against the state in tax matters; that assuming estoppel is available, none was established here; and that in any event interest on the taxes paid under protest should not be allowed.

There is no dispute as to the facts. At the close of 1947, plaintiffs submitted reports to the state insurance commissioner of their gross premiums,* but did not include therein the portion of the premiums received by their bail agents as discussed above and in the Groves case. The commissioner made his report to the State Board of Equalization on the basis of the reports by plaintiffs to him (see Rev. & Tax. Code, § 12403) and the board assessed taxes on that basis against plaintiffs (see Rev. & Tax. Code, § 12431 et seq.) and plaintiffs paid those taxes in 1948. In 1951, the state's attorney general advised the commissioner that all the amounts received by the bail agents were taxable premiums and the commissioner advised plaintiffs that an additional assessment was being included in the 1951 assessments to include those amounts for 1947. The additional assessments were paid under protest and recovery thereof allowed by the trial court.

The gross premium tax law has been in effect since 1911, but until 1951 no surety company has reported the entire amount received by its bail agents. In 1937, licenses were required for bail agents and section 1800 was added to the Insurance

---

*Those reports are required by law. (Rev. & Tax. Code, § 12276.)

Code providing that no insurer shall execute an undertaking on bail except "by and through" a licensed bail agent, which this court considered in *Groves* v. *City of Los Angeles, supra,* 40 Cal.2d 751, as a factor showing that the bail agents were the agents of the insurer and hence amounts received by them for bail bonds were gross premiums received by the insurers and taxed by the Constitution. Plaintiffs as well as all other companies, prior to 1951, considered and reported to the commissioner as gross premiums for bail bonds only the amount actually received by them from the agents. The commissioner and attorney general knew of the practice because of a letter in 1941 from the commissioner to the attorney general asking an opinion on the subject; that request was withdrawn by the commissioner before the attorney general gave an opinion. No objection was ever made by the commissioner to any company for the failure to report the whole bail bond premiums, and, of course, no taxes were collected. Also in 1941 the commissioner held hearings in regard to proposed regulations by him for the bail bond business which were attended by plaintiffs. At the hearing one of the things considered was a form for the receipt given by the bail agent to the applicant for a bond, which was approved. In that receipt, as appears from the method of doing business, the amount charged for the bond was broken down into two categories: one, the amount listed as "premium" for the bond which included only the amount actually received by the company and the other, "fees for arranging bond" which included all of the rest of the charge for the bond, most of which the bail agent retained. In other branches of the surety business there is no such breakdown. Nothing was said about taxes on gross premiums and the commissioner at the hearings said "he wanted the paying public to know where their dollar was going that they spent and that we could either give them a certified copy of the bond with the various charges thereon or, in lieu thereof, break those charges down on a receipt form and that he would approve the receipt form that they would receive."

■ "[T]here are many instances in which an equitable estoppel in fact will run against the government where justice and right require it. (*City of Los Angeles* v. *Cohn,* 101 Cal. 373 [35 P. 1002]; *Fresno* v. *Fresno C. & I. Co.,* 98 Cal. 179 [32 P. 943]; *Sacramento* v. *Clunie,* 120 Cal. 29 [52 P. 44]; *Brown* v. *Town of Sebastopol,* 153 Cal. 704 [96 P. 363, 19 L.R.A.N.S. 178]; *Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d

309 [44 P.2d 547]; *Sutro* v. *Pettit,* 74 Cal. 332 [16 P. 7, 5 Am.St.Rep. 442]; *City of Los Angeles* v. *County of Los Angeles,* 9 Cal.2d 624 [72 P.2d 138, 113 A.L.R. 370]; *Contra Costa Water Co.* v. *Breed,* 139 Cal. 432 [73 P. 189]; *County of Los Angeles* v. *Cline,* 185 Cal. 299 [197 P. 67]; *La Societe Francaise* v. *California Emp. Com.,* 56 Cal.App.2d 534 [133 P.2d 47]; *McGee* v. *City of Los Angeles,* 6 Cal.2d 390 [5 P.2d 925]; *Ernst* v. *Tiel,* 51 Cal.App. 747 [197 P. 809]; *People* v. *Gustafson,* 53 Cal.App.2d 230 [127 P.2d 627]; *Hewel* v. *Hogin,* 3 Cal.App. 248 [84 P. 1002].)'' (*Farrell* v. *County of Placer,* 23 Cal.2d 624, 627 [145 P.2d 570, 153 A.L.R. 323].) (See also *Lorenson* v. *City of Los Angeles,* 41 Cal.2d 334 [260 P.2d 49]; *County of San Diego* v. *California Water etc. Co.,* 30 Cal.2d 817 [186 P.2d 124, 175 A.L.R. 747]; *Tyra* v. *Board of Police etc. Commrs.,* 32 Cal.2d 666 [197 P.2d 710]; *Cooke* v. *Ramponi,* 38 Cal.2d 282 [239 P.2d 638]; *Adams* v. *California Mut. B. & L. Assn.,* 18 Cal.2d 487 [116 P.2d 75].)

█ The government may be estopped in tax matters. (See *Garrison* v. *State,* 64 Cal.App.2d 820 [147 P.2d 711]; *Outer Harbor etc. Co.* v. *Los Angeles,* 49 Cal.App. 120 [193 P. 137]; *Goodwill Industries* v. *County of Los Angeles,* 117 Cal.App. 2d 19 [254 P.2d 877]; *La Societe Francaise* v. *California Emp. Com.,* 56 Cal.App.2d 534 [133 P.2d 47]; *Market St. Ry. Co.* v. *California State Board of Equalization,* 137 Cal.App. 2d 87 [290 P.2d 20]; *Joseph Eichelberger & Co.* v. *Commissioner of Int. Rev.,* 88 F.2d 874; *United States* v. *Brown,* 86 F.2d 798; see discussion and cases, 33 Cornell L.Q. 607; 3 Tax L.Rev. 71; 21 Univ. of Chic. L.Rev. 680; 40 Va.L.Rev. 313.) However, it is the unusual case in which estoppel will be applied in tax cases; the case must be clear and the injustice great (see authorities last cited). This is indicated by the general rules in the field. ''The power of taxation shall never be surrendered or suspended by any grant or contract to which the State shall be a party.'' (Cal. Const., art. XIII, § 6.) It is said in *Market St. Ry. Co.* v. *California State Board of Equalization, supra,* 137 Cal.App.2d 87, 100: ''None of these cases involved reliance on an erroneous administrative tax ruling. The state board cites many cases from this and other jurisdictions to the effect that an estoppel based on reliance upon an erroneous construction of the statute by an administrative ruling will not lie against the government, particularly in tax matters. As a general proposition this is sound law. Obviously, a tax administrator should not be

permitted by an erroneous ruling to exempt a taxpayer from the obligation to pay taxes. But that is as far as the rule goes. The proper limitations on that rule were pointed out by this court in *La Societe Francaise* v. *California Emp. Com.*, 56 Cal.App.2d 534 [133 P.2d 47], in which a petition for hearing was unanimously denied. . . .

"As to that portion of the tax imposed directly on the Societe the court had the following to say (p. 553): 'It is the general rule that the government does not lose its revenues because of an erroneous ruling of an administrative official as to the meaning of a tax law. [Numerous citations.] An administrative regulation which is in conflict with the statute is invalid and the government is not bound thereby. [Citations.] The duty of the tax officials is to collect taxes imposed by law . . . it is generally no defense that taxes were not paid when due in reliance on an official ruling of nonliability. The taxpayer is deemed to act with knowledge that administrative officials cannot bind the government by their erroneous interpretation of tax statutes.' "

■ The facts here do not establish a clear case of estoppel and injustice necessary in tax cases. The failure to collect the tax or object to the sufficiency of the reports of gross premiums made by plaintiffs, although the commissioner thought possibly they were insufficient as shown by his request (later withdrawn) for an opinion from the attorney general is not enough. The request to the attorney general for an opinion was not known by plaintiffs; all they knew was that no objection was made to their reports and taxes were not collected on the entire premiums received by them. ■ Generally ". . . failure to enforce statutes of this state will not estop a state agency from their subsequent enforcement (*Caminetti* v. *State Mut. Life Ins. Co.*, 52 Cal.App.2d 321, 326 [126 P.2d 165] . . .)." (*Richfield Oil Corp.* v. *Crawford*, 39 Cal. 2d 729, 736 [249 P.2d 600].) ■ The failure to collect taxes which are payable under a statute, even though the official thinks they should be, is not sufficient for an estoppel. (See *Goodwill Industries* v. *County of Los Angeles, supra,* 117 Cal.App.2d 19; *La Societe Francaise* v. *California Emp. Com., supra,* 56 Cal.App.2d 534; *El Dorado Oil Works* v. *McColgan,* 34 Cal.2d 731, 739 [215 P.2d 4]; *Gaylord* v. *Commissioner of Int. Rev.,* 153 F.2d 408; 40 Va.L.Rev. 313; *Hotel Kingkade* v. *Commissioner of Int. Rev.,* 180 F.2d 310; *Mt. Vernon Trust Co.* v. *Commissioner of Int. Rev.,* 75 F.2d 938.) And it has been held that an estoppel will not arise

against the government in tax matters where the taxpayer relies on an erroneous construction of a statute by an official. (*Fletcher Trust Co.* v. *Commissioner of Int. Rev.*, 141 F.2d 36; cert. denied 323 U.S. 711 [65 S.Ct. 36, 89 L.Ed. 572]; *Blumberg* v. *Smith*, 138 F.2d 956; *Schafer* v. *Helvering*, 83 F.2d 317 [65 App.D.C. 292]; *Utah Hotel Co.* v. *Industrial Com.*, 107 Utah 24 [151 P.2d 467, 153 A.L.R. 1176]; *Crane Co.* v. *Arizona State Tax Com.*, 63 Ariz. 426 [163 A.L.R. 261].)

With reference to the hearing by the Insurance Commissioner in 1941, in which the form for the receipt to be given by the bail agent to the applicant for a bail bond, which listed premium and fees for expenses separately, the stipulation of facts states: "Subsequent to September 6, 1941, hearings were held by the Insurance Commissioner in Los Angeles, California, with regard to proposed regulations governing the transaction of bail bonds and the conduct of bail agents and regarding the approval by the Insurance Commissioner of certain forms of documents to be used in the transaction of bail bonds." This hearing apparently was an investigation of the bail bond business and the matters considered were in the nature of police regulations for that business. Nothing was said about taxes and the commissioner was interested in having the receipt given to bail bond applicants advise them as to where the money he paid for the bond was going. While the receipt was approved and listed "premium" as the item which plaintiffs actually received, it could be referring only to net premiums rather than gross premiums upon which the tax is levied. There is no necessary relation between the receipt so given and taxes. Taxes were not mentioned. The commissioner had authority to adopt rules and regulations for the conduct of bail bond business (Ins. Code, § 1812; see *Smith* v. *Downey,* 109 Cal.App.2d 745 [241 P.2d 618]) which have to do with the conduct of the business rather than taxes. (See Ins. Code, § 1800 et seq.) In regard to taxes the insurance companies must make a report of their gross premiums to the commissioner (Rev. & Tax. Code, § 12276) and the commissioner makes a report to the State Board of Equalization of the premiums received by each insurer (*id.,* § 12403). The board assesses and levies the tax (*id.,* § 12431) and gives notice thereof to the insurer (*id.,* § 12435) and they are to be paid to the state controller (*id.,* § 12624). Probably the commissioner has authority to question the reports of the insurers to him but the tax is assessed by the board.

▮ Nothing was said about those reports at the hearings held by the commissioner and as far as appears they were not involved. It does not appear therefore that there was a clear representation by the commissioner as to what constitutes taxable premiums such as would satisfy an estoppel in connection with taxes.

*Garrison* v. *State*, 64 Cal.App.2d 820 [149 P.2d 711], involved an express administrative ruling on the taxability for certain employees and is thus distinguishable. Moreover, it holds that an erroneous administrative rule by a tax official necessarily estops the collection of taxes imposed on a person even though there was no showing of reliance and change of position. We need not decide whether an erroneous ruling alone establishes estoppel here (see *Market St. Ry. Co.* v. *California State Board of Equalization, supra*, 137 Cal.App. 2d 87; *La Societe Francaise* v. *California Emp. Com., supra*, 56 Cal.App.2d 534) because we do not have such a ruling known to plaintiffs.

There is no question here of penalties. ▮ The commissioner in his report to the state board in 1951 followed the procedure outlined in the Revenue and Taxation Code which provides for taxes not assessed and not collected, although assessable, because of error or omission on the part of the insurer or computation in a manner contrary to law. The commissioner may include such premiums for past years in his report to the board and the board may assess the additional tax. But the levy and assessment of additional taxes may be for only a specified time. (Rev. & Tax. Code, §§ 12996-12999.)

In regard to reliance by plaintiffs and change of position the only direct evidence on the subject is that by their officers that if they had known in 1947 that a claim would be made that the entire amount received by the bail agent was taxable gross premium they would have charged more for the bond in order to pass on the tax to the taker of the bond. While this may be sufficient it is doubtful that it shows a reliance.

The judgments are reversed.

Gibson, C. J., Traynor, J., Spence, J., and McComb, J., concurred.

SCHAUER, J.—I concur in the judgment, reluctantly, on the ground that it does not appear that on the facts shown in this record an estoppel arose. But this is because of a failure to show a representation by a responsible agent of gov-

ernment upon which a taxpayer could reasonably rely. I do not concur in any implication that as a matter of law an estoppel cannot be invoked by a taxpayer as against the government's claim for a deficiency, if in fact the taxpayer relied upon an administrative representation and as a result lost the opportunity to pass the tax on to others.

Preliminarily, a distinction must be recognized between the case wherein the taxpayer acts as a mere collection agent, and that in which a tax is imposed directly on the taxpayer. The unemployment insurance tax illustrates this distinction: the employer withholds a certain sum from the salary of his employes, as to which he acts as a collection agency only; he also remits a sum based on the total salaries paid, as to which he is the principal taxpayer. In such a case, if the taxpayer is informed by the proper authority that certain employes are not subject to the tax, and therefore no remittances are made with respect to the salaries paid to such employes, and if the authority later changes its position and declares a tax due, the government may be able to collect the amounts the employer should have paid on his own account, but it will not be allowed to recover from the employer the amounts which should have been withheld from the employes' salaries. (*Garrison* v. *State* (1944), 64 Cal.App.2d 820 [149 P.2d 711]; *La Societe Francaise* v. *California Emp. Com.* (1943), 56 Cal.App.2d 534 [133 P.2d 47].)

Where a taxpayer has refrained from paying a tax for which he is primarily liable because of reliance upon an erroneous administrative interpretation, it has been held in a number of cases that he must pay an asserted deficiency, even though he would have been able to pass on the tax had he not relied on the administrative position that no tax was due. (*Market St. Ry. Co.* v. *California State Board of Equalization* (1955), 137 Cal.App.2d 87 [290 P.2d 20]; *Duhame* v. *State Tax Com.* (1947), 65 Ariz. 268 [179 P.2d 252, 171 A.L.R. 684]; *Crane Co.* v. *Arizona State Tax Com.* (1945), 63 Ariz. 426 [163 P.2d 656, 163 A.L.R. 261]; *Bennetts, Inc.* v. *Carpenter* (1943), 111 Colo. 63 [137 P.2d 780].) Inspection discloses, however, that the Duhame and Bennetts cases are of little weight in California. In Duhame the court disposed of the estoppel question by saying that "there can be no estoppel against a government or governmental agency with reference to the enforcement of taxes" (p. 260 of 179 P.2d); similarly, in Bennetts the court merely stated that "It is a general principle of law that the doctrine of estoppel cannot be invoked against any govern-

mental agency, acting in its public capacity'' (p. 782 of 137 P.2d). But the rule is established in California that estoppel may be invoked against a government entity where ''justice and right require it.'' (*Farrell* v. *County of Placer* (1944), 23 Cal.2d 624, 627 [145 P.2d 570, 153 A.L.R. 323].)

The Market Street Railway case relied strongly on the Crane case, and the Crane case was based on the distinction made in *La Societe Francaise* v. *California Emp. Com.* (1943), *supra*, 56 Cal.App.2d 534, between a tax imposed directly on the taxpayer and a tax as to which he acted merely as a collection agent. The Societe Francaise case, as noted above, involved an unemployment insurance tax, and in that case the employer was held liable for the amounts he would have paid had the employes been properly included on its tax return, although not for the amounts which should have been withheld from the salaries of the particular employes. The Market Street Railway case (involving the sales tax) represents a square California holding by the District Court of Appeal that no estoppel will be raised merely because the taxpayer had a right to pass on the taxes to the purchaser, where he was under no statutory duty to do so, even though the only reason he failed to pass on the tax was because of reliance on the erroneous administrative ruling. But the principal basis of the Market Street Railway case is in ultimate analysis (through the Crane case) the Societe Francaise case.

The true theory of the Societe Francaise case seems to appear at page 555 of 56 Cal.App.2d, where the court stated: ''. . . in the present case a proper regard for the protection of the interests of the government in its revenues, with recognition also of a degree of responsibility on the part of the government to a taxpayer who has relied to his prejudice on an official ruling, is achieved by requiring the taxpayer to discharge that part of the tax burden which it was contemplated it should bear by the statute imposing the tax, while relieving it from liability for the employees' contributions and interest on delayed payments. *The taxpayer will pay from its own funds as much as it would have paid originally but for the erroneous administrative ruling, but it will not pay more.*'' (Italics added.) But La Societe Francaise is essentially a nonprofit organization and there was no showing that it could have passed on its costs to its customers. In a similar case, where the employer was an insurance company, the court relieved the taxpayer of liability both for the employees' share and for the employer's share of the tax. (*Garrison* v. *State of*

*California* (1944), *supra,* 64 Cal.App.2d 820.) The court there reasoned, at page 829 (after the rule for the erroneous exemption of the particular employes had been rescinded), "collection of the employees' percentage [which had become due] during the time the rule was in effect was for all practical purposes difficult and expensive if not impossible. With the lapse of time involved and *periodical allocation of costs to policyholders,* it would be unfair now to require the insurance company to pay its contributions for these employees." (Italics added.) (See also *Waterbury Savings Bank* v. *Danaher* (1940), 128 Conn. 78 [20 A.2d 455, 462], where the court, following the same principle as that followed by the District Court of Appeal in the Garrison case, declared that "Where it appears that it is against public policy that an administrative officer should change a decision with retroactive effect, it is the court's right and duty to curb his powers so as to serve that policy.") If the taxpayer is to be assessed only for the amount which it would have paid from its own funds in the absence of reliance upon the erroneous administrative action, then it is inconsistent to charge it for an amount which would have been passed on to, and borne by, the ultimate consumer had the tax been properly levied. This is especially true with respect to insurance companies, whose annual premium rates are a reflection of their prior and anticipated operating costs.

Thus it appears that a governmental agency may be estopped to assert a tax deficiency, where the reason for the original nonpayment was reliance on an administrative representation which proved to be erroneous, if the taxpayer can show that he could and would have passed on the tax to his customers had he not relied on the ruling that it was not due, and that he can no longer so pass it on. Here, if the representations which were made by the state insurance commissioner had instead been made by the state board of equalization, a different result would be indicated.

For the reasons and subject to the limitations above stated I concur in the judgment.

Shenk, J., concurred.

Respondents' petitions for a rehearing were denied December 24, 1956.