[Civ. No. 25175. Second Dist., Div. One. Jan. 8, 1962.]

U. S. INDUSTRIES, INC., et al., Plaintiffs and Appellants, v. STATE BOARD OF EQUALIZATION, Defendant and Respondent.

Richards, Watson, Smith & Hemmerling for Plaintiffs and Appellants.

Stanley Mosk, Attorney General, Dan Kaufmann, Assistant Attorney General, and Jay L. Shavelson, Deputy Attorney General, for Defendant and Respondent.

FOURT, J.—This appeal is by the plaintiffs from a judgment rendered in favor of the defendant in an action for refund of sales tax. The action for refund of sales tax was pursuant to section 6933 of the Revenue and Taxation Code.[1]

The question presented is whether the sale by a manufacturer (in this case several manufacturers) of the entire business, including office furniture and machinery used as part of the manufacturing operation, is subject to sales tax, and if so, whether it is constitutional.

The cause was submitted to the trial court on a stipulation of facts and the facts as set forth therein, and found by the court to be true, are in pertinent part as follows:

"1. U. S. INDUSTRIES, INC., is a Delaware corporation and is the successor to PRESSED STEEL CAR Co., INC., a Pennsylvania corporation . . . For convenience, U. S. INDUSTRIES, INC. and PRESSED STEEL CAR Co., INC. are hereinafter referred to as 'USI.'

"2. The NOSLEXA COMPANY was a California corporation . . . whose former name was AEXLSON MANUFACTURING COMPANY. For convenience, AXELSON . . . and the NOSLEXA COMPANY are hereinafter referred .to as 'Noslexa.' Prior to the sale of its business and assets to USI pursuant to the contract of sale referred to in Paragraph 5 of this Stipulation, and without any interruption of its business prior to said sale, Noslexa was engaged in manufacturing and selling machine tools, oil well equipment, and aircraft components,

---

[1] All references to code sections will be to the Revenue and Taxation Code unless indicated to the contrary.

and held a permit with respect to such manufacturing and selling under Article 2 of Chapter 2 of the Sales and Use Tax Law of California (§ 6066 ff. Revenue and Taxation Code). The net receipts from sales of said manufactured goods by Noslexa, not including returns and discounts, between April 1, 1950, and October 8, 1952, the period of the closing audit by the California State Board of Equalization, was $34,512,-642.19. Many hundreds of said sales during this period, of a net amount of $6,313,090.36, not including returns and discounts, were retail sales, i.e., for purposes other than resale in the regular course of business, and sales taxes were duly paid by Noslexa to the State of California upon said sales. Said taxable sales of manufactured goods between January 1, 1952, and October 8, 1952, the closing date specified in the aforesaid contract of sale, not including returns and discounts, totaled $1,958,025.82.

"3. Mostum, Inc., was a California corporation whose . . . former name was Southern Pipe & Casing Company. For convenience, Southern Pipe & Casing Company and Mostum, Inc., are hereinafter referred to as 'Mostum.' Prior to the sale of its business and assets to USI pursuant to the contract of sale referred to in Paragraph 6 of this Stipulation, and without any interruption of its business prior to said sale, Mostum was engaged in manufacturing and selling coated and uncoated steel pipe, and held a permit with respect to such manufacturing and selling under Article 2 of Chapter 2 of the Sales and Use Tax Law of California (§ 6066 ff. Revenue and Taxation Code). The net receipts from sales of said manufactured goods by Mostum, not including returns and discounts, between July 1, 1952, and October 24, 1955, the period of the closing audit by the California State Board of Equalization, was $30,066,309.51. Many hundreds of sales during this period, of a net amount of $12,212,278.60, not including returns and discounts, were retail sales, i.e., for purposes other than resale in the regular course of business, and sales taxes were duly paid by Mostum to the State of California upon said sales. Said taxable sales of manufactured goods by Mostum during the period between January 1, 1955, and October 24, 1955, the closing date specified in the aforesaid contract of sale, not including returns and discounts, totaled $3,952,287.01.

"4. Doncliff, Inc., was a California corporation whose . . . former name was Western Design & Manufacturing

CORP. For convenience, WESTERN DESIGN & MANUFACTURING CORP. and DONCLIFF, INC., are hereinafter referred to as 'Doncliff.' Prior to the sale of its business and assets to USI pursuant to the contract of sale referred to in Paragraph 7 of this Stipulation, and without any interruption of its business prior to said date, Doncliff was engaged in manufacturing and selling aircraft components and electronic devices, and held a permit with respect to such manufacturing and selling under Article 2 of Chapter 2 of the Sales and Use Tax Law of California (§ 6066 ff. Revenue and Taxation Code). The net receipts from sales of said manufactured goods by Doncliff, not including returns and discounts, between December 1, 1953, and August 15, 1956, the period of the closing audit by the California State Board of Equalization, was $2,491,321.27. Nine of said sales during this period, of a net amount of $5,766.66, not including returns and discounts, were retail sales, i.e., for purposes other than resale in the regular course of business, and sales taxes were duly paid by Doncliff to the State of California upon said sales. . . .

"5. On September 2, 1952, USI entered into a written contract with Noslexa pursuant to which USI acquired as of October 8, 1952, the closing date specified in said contract, all of the business, properties and assets of Noslexa in exchange for the issuance and delivery to Noslexa as of October 8, 1952, 537,930 shares of common stock of USI. As of June 30, 1952, the capital structure of USI was as follows:

"Common stock ............... 1,045,500 shares
"Preferred stock ($50 par) ...... 77,855 shares

"Said capital structure remained substantially unchanged until the issuance of 537,930 additional shares of common stock, pursuant to said contract, on or about October 8, 1952. There did not exist at any time prior to October 8, 1952 any affiliation of any kind between USI and Noslexa, nor any common ownership of the stocks or bonds of or any other interest in the said two corporations. As a part of the transaction, USI assumed and agreed to pay all liabilities, obligations and commitments whatsoever of Noslexa, whether known or unknown. During the period between the execution of said contract and October 8, 1952, Noslexa continued to conduct its business in the customary manner, and subsequent to October 8, 1952, Noslexa was dissolved.

"6. On October 24, 1955, USI entered into a written contract with Mostum pursuant to which USI acquired as of

November 1, 1955, the closing date specified in said contract, all of the business, properties and assets of Mostum in exchange for $200,000.00 plus the issuance and delivery to Mostum of convertible subordinated debentures of USI in the principal amount of $3,715,000.00 (convertible into USI common stock at the rate of one share of common per $13.93 of principal amount). As of December 31, 1954, the capital structure of USI was as follows:

"Common stock .............. 1,583,249 shares
"Preferred stock ($50 par) ...... 63,355 shares
"Convertible subordinated debentures
 (convertible into common at the
 aforementioned rate) ............. $5,293,000

"Said capital structure remained substantially unchanged until the issuance of $3,715,000.00 in additional debentures pursuant to said contract, on or about November 1, 1955. There did not exist at any time prior to November 1, 1955, any affiliation of any kind between USI and Mostum, nor any common ownership of the stocks or bonds of or any other interest in the said two corporations. As a part of the transaction, USI assumed and agreed to pay all liabilities, obligations and commitments whatsoever of Mostum, whether known or unknown. During the period between the execution of said contract and November 1, 1955, Mostum continued to conduct its business in the customary manner, and subsequent to November 1, 1955, Mostum was dissolved.

"7. On July 31, 1956, USI entered into a written contract with Doncliff pursuant to which USI acquired, as of August 15, 1956, the closing date specified in said contract, all of the business, properties and assets of Doncliff in exchange for $75,000.00, plus the issuance and delivery to Doncliff of shares of common stock of USI having an aggregate market value as of said closing date equal to $525,000.00, i.e., 30,882 shares. As of December 31, 1955, the capital structure of USI was as follows:

"Common stock .................1,802,981 shares
"Preferred stock ($50 par value) ... 55,246 shares
"Convertible subordinated debentures (convertible into USI common stock at the rate of one share of common per $13.93 of principal amount) ......................$7,795,300

"Said capital structure remained substantially unchanged until the issuance of said 30,882 shares of common stock pursuant to said contract on or about August 15, 1956. There did not exist at any time prior to August 15, 1956, any affiliation of any kind between USI and Doncliff, nor any common ownership of the stocks or bonds of or any other interest in the said two corporations. As a part of the transaction, USI assumed and agreed to pay all liabilities, obligations, and commitments whatsoever of Doncliff, whether known or unknown. During the period between the execution of the contract and August 15, 1956, Doncliff continued to conduct its business in the customary manner, and subsequent to August 15, 1956, Doncliff was dissolved.

"8. During the period of twelve months prior to the sale to USI of Noslexa's business and assets, Noslexa has made seventeen sales (other than trade-ins), for a total consideration of $47,617.04 of capital assets, held or used by Noslexa in the course of its aforesaid manufacturing and selling operations. Of these seventeen sales, eleven sales for a total consideration of $30,885.64 were retail sales . . . and sales taxes were duly paid upon the full amount of said · eleven sales . . . and six sales for a total consideration of $16,731.40 were for purposes of resale in the regular course of business. . . . During the period of ten months prior to the sale to USI of Noslexa's business and assets, Noslexa had traded in, for purposes of resale in the regular course of business, on thirty-three separate occasions, automobiles, trucks, office equipment, and machinery, held or used by Noslexa in the course of its business, of a total value of $29,735.78. . . . All sales referred to in this Paragraph 8 were prior to and in addition to the aforesaid sale by Noslexa of its business, properties and assets to USI, and are in addition to the sales of manufactured goods referred to in Paragraph 2 hereof.

"9. During the period from July 1, 1952, to October 24, 1955, the period of said closing audit, Mostum made . . . retail sales of capital assets held or used by Mostum in the course of its aforesaid manufacturing and selling operations. Said sales were retail sales . . . and sales taxes were duly paid thereon. . . . During the same period, Mostum traded in . . . capital assets held or used by Mostum in the regular course of its aforesaid manufacturing and selling operations. Said trade-in sales were for purposes of resale in the regular course of business. . . . During the same period, Mostum's

employees were required to provide and wear safety shoes and safety glasses. As an accommodation to such employees, Mostum purchased supplies of such items and sold them to the employees for their use at cost. During the twelve month period immediately prior to the sale by Mostum of its business, properties and assets to USI, said sales of safety shoes and safety glasses totaled approximately $7,706.32. All sales referred to in this Section 9 were prior to and in addition to the aforesaid sale by Mostum of its business, properties and assets to USI, and are in addition to the sales of manufactured goods referred to in Section 3 hereof.

"10. During the period between January 1, 1956, and August 15, 1956, Doncliff obtained production orders from Convair Division of General Dynamics Corporation for three items of electronic devices for jet aircraft and missiles for the manufacture of which special tooling was required. As part of the the [sic] original quotations on each production order, Doncliff included a bid to acquire such tooling and to sell the tooling, after it had been used in the manufacture of the electronic devices, to the purchaser of the electronic devices upon completion of manufacture of the electronic devices. The tooling consisted of approximately 100 items . . . Doncliff did not claim depreciation on the tooling; the tooling was charged by Doncliff to 'Inventory' in its books and records when purchased and was charged to cost of sales when sold; the sales of the tooling to the purchaser of the electronic devices was contemplated by the parties from the inception of the quotation to produce the electronic devices. The sales of tooling were made under purchase orders dated April 2, 1956, May 7, 1956 and May 17, 1956, for a total consideration of $85,350.00. Said sales . . . were made and billed to . . . Convair . . . for purposes of resale in the regular course of business, and were prior to and in addition to the aforesaid sale by Doncliff of its business, properties and assets to USI, and are in addition to the sales of manufactured goods referred to in Paragraph 4 hereof.

"11. The assets sold by Noslexa, Mostum and Doncliff to USI, pursuant to the contracts of sale referred to in Paragraphs 5, 6 and 7 hereof, in each case included various items of machinery, tooling, equipment, furniture, fixtures, trucks and automobiles, theretofore used by the respective sellers in their aforesaid manufacturing and selling operations, and thereafter used by USI for purposes other than resale in the

regular course of business, i.e., in conducting similar manufacturing and selling operations.

"In connection with the sale by Noslexa to USI, Noslexa was required to pay a sales tax with respect to the aforesaid items of machinery, tooling, equipment, furniture, fixtures, trucks and automobiles included in the sale in the amount of $23,483.76, plus interest of $469.68, totaling $23,953.44.

"In connection with the sale by Mostum to USI, Mostum was required to pay a sales tax with respect to the aforesaid items of machinery, tooling, equipment, furniture, fixtures, trucks and automobiles included in the sale in the amount of $7,799.46, plus interest of $233.99, totaling $8,033.45.

"In connection with the sale by Doncliff to USI, Doncliff was required to pay a sales tax with respect to the aforesaid items of machinery, equipment, furniture, fixtures, trucks and automobiles included in the sale in the amount of $8,760.00, plus interest of $131.25, totaling $8,891.25.

"In each case, payment was made with funds furnished by and belonging to USI.

"12. Claims for refunds of the sales taxes so paid were duly filed . . . under Article 1 of Chapter 7 of the Sales and Use Tax Law of California (§ 6901 ff. Revenue and Taxation Code). . . .

"13. A hearing upon the aforesaid claims for refund was had before the State Board of Equalization. . . . Thereafter . . . the taxpayers were notified that their claims for refunds were denied in the full amount."

The trial court, in addition to finding the facts set forth in the stipulation to be true, made the following findings of fact and conclusions of law:

"I

". . . The sales of their business and assets to U.S.I. by Noslexa, Mostum, and Doncliff, insofar as said sales included machinery, tooling, equipment, furniture, fixtures, trucks, automobiles, or any other items of tangible personal property, and in connection with which Noslexa, Mostum, and Doncliff were required to pay sales taxes as stated in paragraph 11 of the Stipulation of Facts are hereinafter referred to as 'the sales in question.' Noslexa, Mostum, and Doncliff are sometimes hereinafter referred to as 'the selling corporations.'

"II

"At the times of the sales in question, and at all times pertinent herein, the selling corporations, and each of them, were

engaged in the business of selling tangible personal property of a kind the gross receipts from the retail sale of which are required to be included in the measure of the sales tax.

## "III

"The sales in question, and each of them, were retail sales.

## "IV

"Each of the selling corporations made more than two retail sales of tangible personal property during the period including the sale in question made by it.

## "V

"At the times of the sales in question, and at all times pertinent herein, the selling corporations, and each of them, were retailers.

## "VI

"All of the property included in each of the sales in question was held and used by the selling corporation in the course of an activity for which said selling corporation was required to hold, and did in fact hold, a seller's permit.

## "VII

"Each sale in question was one of a series of sales by the selling corporation sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit by the selling corporation.

## "VIII

"After each of the sales in question the real and ultimate ownership of the property included in such sale was substantially dissimilar to that which existed before such sale.

## "IX

"None of the sales in question was an occasional sale.

## "X

"The impositions of sales taxes upon plaintiffs herein, and each of them, by virtue of the sales in question, and each of them, were based upon a reasonable classification for which there were good grounds, and such impositions do not deprive plaintiffs of equal protection of the laws under the United States and California Constitutions, or either of them.

". . . . . . . . . . . . . .

"Conclusions of Law
"I

"Each of the selling corporations was a 'retailer' within the meaning of Sections 6015 and 6019 of the Revenue and Taxation Code.[2]

"II

"Each of the sales in question was a 'retail sale' within the meaning of Section 6007 of the Revenue and Taxation Code.[3]

"III

"The gross receipts from each of the sales in question were subject to the sales tax imposed by Section 6051 of the Revenue and Taxation Code.[4]

"IV

"None of the sales in question was an 'occasional sale' within the meaning of Section 6006.5 of the Revenue and Taxation Code.[5]

---

[2]Sections 6015 and 6019 provide in pertinent part:
"§ 6015. 'Retailer.' 'Retailer' includes:
"(a) Every seller who makes any retail sale or sales of tangible personal property, and every person engaged in the business of making retail sales at auction of tangible personal property owned by the person or others."
"§ 6019. [Retailer; persons included; number of sales:]
"'Every individual, firm, copartnership, joint venture, trust, business trust, syndicate, association or corporation making more than' two retail sales of tangible personal property during any 12-month period, including sales made in the capacity of assignee for the benefit of creditors, or receiver or trustee in bankruptcy, shall be considered a retailer within the provisions of this part in his or its individual, firm, copartnership, joint venture, trust, business trust, syndicate, associate or corporate capacity."

[3]Section 6007 provides in part:
"§ 6007. 'Retail sale': 'Sale at retail.'
"A 'retail sale' or 'sale at retail' means a sale for any purpose other than resale in the regular course of business in the form of tangible personal property. . . ."

[4]Section 6051 provides in part:
"§ 6051. [Levy on retailers' gross receipts; rate.]
"For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers at the rate of . . ."

[5]Section 6006.5 provides:
"§ 6006.5. [Occasional sale; real or ultimate ownership:]
"'Occasional sale' includes:
"(a) A sale of property not held or used by a seller in the course of an activity for which he is required to hold a seller's permit, provided such sale is not one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit;
"(b) Any transfer of all or substantially all the property held or used by a person in the course of such an activity when after such trans-

"V

"The imposition of the sales tax upon the sales in question does not deprive plaintiffs of equal protection of the laws under either the United States or California Constitutions.

"VI

"Defendant State Board of Equalization properly and legally assessed and collected sales tax upon each of the sales in question.

"VII

"Plaintiffs, and each of them, are entitled to take nothing by this action. Defendant is entitled to recover its costs herein taxed at $_____."

Appellants' first contention is that "The Single Sale of the Entire Assets of a Going Business Is an Occasional Sale and Is Exempt From Sales Tax Under Section 6367 of the Revenue and Taxation Code."

Section 6367 provides: "There are exempted from the taxes imposed by this part the gross receipts from occasional sales of tangible personal property and the storage, use, or other consumption in this State of tangible personal property, the transfer of which to the purchaser is an occasional sale."

The substance of appellants' contention is that the sale of the entire business must be deemed an occasional sale since none of the appellants were in the business of selling their businesses.

In support of this position, appellants cite authorities from other jurisdictions and one California superior court decision. It is interesting to note that two of the authorities relied upon, *Novak* v. *Redwine,* 89 Ga.App. 755 [81 S.E.2d 222] and *State* v. *Dyson,* 89 Ga.App. 791 [81 S.E.2d 217], were expressly rejected in *Market St. Ry. Co.* v. *California State Board of Equalization,* 137 Cal.App.2d 87 [290 P.2d 20]. Mr. Justice Peters, speaking for the court, stated at pages 97-98:

"Market also refers to two Georgia cases where it was held that the Georgia sales tax statute did not apply to the sale of an entire business. (*Novak* v. *Redwine,* 89 Ga.App. 755 [81 S.E.2d 222]; *State* v. *Dyson,* 89 Ga.App. 791 [81 S.E.2d 217].) The *Novak* case is the key case. Under a statute sub-

fer the real or ultimate ownership of such property is substantially similar to that which existed before such transfer. For the purposes of this section, stockholders, bondholders, partners, or other persons holding an interest in a corporation or other entity are regarded as having the 'real or ultimate ownership' of the property of such corporation or other entity."

stantially similar to ours, that case undoubtedly held that a sale by a retail baker of his bakery business and store fixtures was not taxable, the court reasoning that the baker was not 'engaged in the business' of selling the bakery and the fixtures. The rationale of the Georgia cases is that the Georgia statute was not intended to apply to casual and isolated sales by retailers, but only applied to sales made in the regular course of business. In other words, the Georgia court interpreted the term 'business' in its common and accepted meaning. (*Novak* v. *Redwine,* 89 Ga.App. 755 [81 S.E.2d 222, 223, 225].) But this interpretation is directly contrary to that made by the Supreme Court in *Bigsby* v. *Johnson,* 18 Cal.2d 860, 863 [118 P.2d 289], and by the appellate court in *Los Angeles etc. Sch. Dist.* v. *State Board of Equalization,* 71 Cal.App.2d 486, 488 [163 P.2d 45].) These cases have already been discussed. For this reason the Georgia cases are not persuasive.''

The liquidation sale in the *Market St. Ry. Co.* case, *supra,* occurred prior to the enactment of section 6367. The taxability of a liquidation sale made subsequent to the enactment of section 6367 was decided in *Sutter Packing Co.* v. *State Board of Equalization,* 139 Cal.App.2d 889 [294 P.2d 1083]. In *Sutter,* the taxpayer contended that the liquidation sale was an isolated transaction since Sutter was not engaged in the business of selling its business. The court in rejecting this contention stated at pages 895-896:

''There appears to be nothing, however, inherently different in the nature of the items sold in the final sale than in the earlier sales of used equipment, although it is true that it was a much larger sale of a greater variety of items. Appellant says that this was truly an occasional sale since the sale of the entire assets could happen only once. However, the same may be said for each smaller item sold. Similar sales might be made, and appellant herein had, in fact, made a similar sale of all of its equipment and machinery in the plant in 1945.

''The fact alone that the last sale was made in liquidation of a business is apparently not such a distinction in the nature of the sale as to warrant an exemption if it would otherwise have been considered part of a series of sales sufficient in number, scope and character to constitute an activity requiring a seller's permit and subjecting it to the tax. In the *Market Street Railway* case, *supra,* it was held that several sales of personal property made between December 29, 1944, and December 31, 1948, in liquidation of Market's nonopera-

tive properties were liable for the sales tax. This includes some sales made after the 1947 amendments and supports our holding that the fact that the sale is a liquidation sale is not controlling in determining whether a sale is occasional." (See *Pacific Pipeline Constr. Co.* v. *State Board of Equalization*, 49 Cal.2d 729 [321 P.2d 729], where transfer of assets on reorganization was held taxable.)

 The fact that appellants sold their entire businesses does not per se mean that such sales constituted occasional sales. The Legislature has expressly set forth what does constitute an "occasional sale" in section 6006.5. (See footnote 5.) The Legislature further provided that "Except where the context otherwise requires, the definitions given in this chapter govern the construction of this part." (§ 6002.)

 The Supreme Court has clearly indicated that the "occasional sales" exemption is limited by the specific language of section 6006.5. It was stated in *Pacific Pipeline Constr. Co.* v. *State Board Equalization, supra*, 49 Cal.2d 729, 735:

"[7] Since neither subdivision (a) nor subdivision (b) of section 6006.5 applies to the sale in question, *and since no other provision of law exempts it from the operation of section 6051, that section controls.*" (Emphasis added.)

 Factually, the sales by appellants do not come within subdivision (a) of section 6006.5.[6] It has been expressly stipulated by the parties, and found to be true by the trial court, that the sales in question, to the extent they were taxed, consisted of machinery, tooling, equipment, furniture, fixtures, trucks and automobiles, ". . . theretofore used by the respective sellers in their aforsaid manufacturing and selling operations, and thereafter used by USI for purposes other than resale in the regular course of business, i.e., in conducting similar manufacturing and selling operations." (Paragraph 11 of stipulation of facts.) It was further stipulated that each of the selling corporations in fact held a seller's permit in relation to such manufacturing and selling activity. (Paragraphs 2, 3 and 4 of stipulation of facts.) The trial court

---

[6]Subdivision (a) of section 6006.5 provides:

" 'Occasional sale' includes:

"(a) A sale of property not held or used by a seller in the course of an activity for which he is required to hold a seller's permit, provided such sale is not one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit."

found (Finding VI) that ''All of the property included in each of the sales in question was held and used by the selling corporation in the course of an activity for which said selling corporation was required to hold, and did in fact hold, a seller's permit.'' In addition, each sale in question was one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit. (See paragraphs 8, 9 and 10 of stipulation of facts.)

■ It is equally clear that the sales in question were not ''occasional sales'' within the meaning of subdivision (b) of section 6006.5.[7]

Paragraphs 5, 6 and 7 of the stipulation of facts show that there existed no affiliation between USI and any of the selling corporations prior to the sales in question, and that after said sales, the selling corporations held small minority interests in USI, i.e., the ownership was not ''substantially similar to that which existed before such transfer.''

■ Appellants' next contention is that the imposition of a sales tax upon these sales violates the ''. . . Equal Protection of the Laws Guaranteed by the 14th Amendment to the Federal Constitution and by Article I, Sections 11 and 21, of the California Constitution.''

In support of their position appellants state, ''It is clear that no tax would be payable if a business concern not required to hold a sales tax permit, such as a seller of food products, had made a single sale of its machinery, equipment, furniture and fixtures.'' This statement has no relation to the facts presented in the case at bar. The property included in each of the sales in question was held and used by the selling corporation in the course of an activity for which said selling corporation was required to hold, and did in fact hold, a seller's permit. (Finding VI.) Each of the final sales in question was one of a series sufficient in number, scope, and character to constitute an activity requiring the holding of a seller's permit. (Finding VII.) Thus, the selling corporation

---

[7]Subdivision (b) of section 6006.5 provides:

'' 'Occasional sale' includes

''(b) Any transfer of all or substantially all the property held or used by a person in the course of such an activity when after such transfer the real or ultimate ownership of such property is substantially similar to that which existed before such transfer. For the purposes of this section, stockholders, bondholders, partners, or other persons holding an interest in a corporation or other entity are regarded as having the 'real or ultimate ownership' of the property of such corporation or other entity.''

would have been taxable under the law even if they had conducted businessses not otherwise requiring the holding of sellers' permits. (See *Market St. Ry. Co.* v. *California State Board of Equalization, supra,* 137 Cal.App.2d 87 ; *Sutter Packing Co.* v. *State Board of Equalization, supra,* 139 Cal.App.2d 889, which involved a food processing business exempt under § 6359.)

In *Roth Drug, Inc.* v. *Johnson,* 13 Cal.App.2d 720 [57 P.2d 1022], the Retail Sales Tax Act was attacked on the ground that it contravened the United States and California Constitutions by unreasonably discriminating with respect to different classes of business to which it applied. The allegedly invalid discriminations were those between retail and wholesale merchants, tangible and intangible personal property, and exempted and nonexempted tangible personal property. The court in sustaining the validity of the tax stated at pages 732-733 :

"We are of the opinion the California Retail Sales Tax Act does not violate article XIV, section 1, of the federal Constitution by abridging the privileges or immunities of any citizen, nor does it deprive any person of property without due process of law, for any of the reasons assigned, or at all. Nor do we think the act violates article I, section 11, of the Constitution of California, which provides that 'All laws of a general nature shall have a uniform operation.'

"The power of a state to levy and collect taxes for governmental purposes is necessarily very broad. It is said in 2 Cooley's Constitutional Limitations, eighth edition, page 986, in that regard :

" 'The power to impose taxes is one so unlimited in force and so searching in extent, that the courts scarcely venture to declare that it is subject to any restrictions whatever, except such as rest in the discretion of the authority which exercises it. It reaches to every trade and occupation; to every object of industry, use, or enjoyment; to every species of possession ; and it imposes a burden which, in case of failure to discharge it, may be followed by seizure and sale or confiscation of property. No attribute of sovereignty is more pervading, and at no point does the power of government affect more constantly and intimately all the relations of life than through the exactions made under it.'

"So, also, the power of the states to make classifications of persons or property for the purpose of taxation is very broad.

(*Adams* v. *Standard Oil Co.*, 97 Miss. 879 [53 So. 692].) A statute is presumed to be constitutional until the contrary appears. It has been said that an act may not be held to be unconstitutional merely because it may contain provisions which seem to be unjust or oppressive, or because it may be deemed to violate the natural, social, or political rights of citizens, unless it appears that those features of the act contravene rights which are guaranteed by the Constitution. (1 Cooley's Constitutional Limitations, 8th ed., p. 341.) If a classification of persons or occupations made for the purpose of imposing taxes is founded on natural, intrinsic or fundamental distinctions which are reasonable in their relation to the object of the legislation and otherwise, they will be deemed to be valid and binding. (5 Cal. Jur., p. 824, § 188.) In determining the validity of classifications for the purpose of imposing taxes, it has been said that the classes or groups of persons legally and naturally affected by the statute should be considered. While it is necessary that the law shall affect alike all persons in the same class and under similar conditions, so long as the law operates alike on all persons and property under the same conditions, it is not subject to criticism on the ground that it is not uniform. While the classification should be reasonable, natural and just, in the absence of a showing to the contrary, it will be assumed there are good grounds for the classification, and the act will be upheld. (6 R.C.L., p. 378, §§ 369-376.) In the case of *People* v. *Monterey Fish Products Co.*, 195 Cal. 548, 556 [234 P. 398, 401, 38 A.L.R. 1186], it is said in that regard:

" 'When a legislative enactment is attacked upon this ground [of an unauthorized classification] all presumptions and intendments are in favor of the reasonableness and fairness of the legislative action (5 Cal. Jur., § 628 et seq., and cases cited), and the decision of the legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary.' " (See also: *Madden, Executor* v. *Kentucky*, 309 U.S. 83, 84, 87-88 [60 S.Ct. 406, 84 L.Ed. 590, 125 A.L.R. 1383]; *New York Rapid Transit Corp.* v. *City of New York*, 303 U.S. 573, 578 [58 S.Ct. 721, 82 L.Ed. 1024]; *Richfield Oil Corp.* v. *Franchise Tax Board*, 169 Cal.App.2d 331, 335-336 [337 P.2d 237]; *People* v. *Keith Railway Equipment Co.*, 70 Cal.App.2d 339, 350-358 [161 P.2d 244].)

It is possible to think of situations where one business may

be subjected to a tax upon a certain retail sale whereas another business would not be taxed for a similar sale. For example, in *Rigsby* v. *Johnson*, 18 Cal.2d 860 [118 P.2d 289], a printer was taxed upon a single sale of an item of capital equipment. A person engaged in a purely "service" type of business may not have been taxed upon such a single sale. However, the Supreme Court indicated that arguments for the exemption of sales different in kind from those ordinarily made "must be directed to the Legislature rather than to the courts" and thereby implied that such a distinction did not involve any constitutional limitation upon the Legislature's power.

For the reasons stated the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied February 5, 1962, and appellants' petition for a hearing by the Supreme Court was denied March 7, 1962.