[Civ. No. 24781.    First Dist., Div. Four.    Oct. 22, 1968.]

GLASS-TITE INDUSTRIES, INC., Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

692

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and E. Clement Shute, Jr., Deputy Attorney General, for Defendant and Appellant.

Thacher, Jones, Casey & Ball and James F. Thacher for Plaintiff and Respondent.

DEVINE, P. J.—The State Board of Equalization appeals from a judgment awarding respondent Glass-Tite Industries, Inc. the sum of $8,024 plus interest. The principal amount is for refund of taxes. It is conceded by appellant that respondent had exhausted its administrative remedies. Also, the parties are in agreement on the facts. The question is whether the sale of a business with all of its assets is, under the agreed facts, exempt from the sales tax.

## The Facts

*The Sale.* On December 29, 1961, Saegertown Glasseals, Inc. (Saegertown) sold to Glass-Tite Industries, Inc. (Glass-Tite) all of its machinery and equipment, furniture and fixtures, and an automobile, the net book value of all being $198,508. In exchange, Saegertown received Glass-Tite common stock, valued at $200,615; and it is on this valuation that the tax was computed. Glass-Tite agreed to pay outstanding obligations of Saegertown, including the disputed assessment of the sales tax, and Glass-Tite did pay the tax.

By acquiring the Glass-Tite stock, the stockholders of Saegertown became owners of 48 percent of the capital stock of Glass-Tite.

*The Product of Saegertown and Its Sales.* Saegertown manufactured diode subassemblies. These consisted of a piece of copper wire slightly over one inch long sealed into a small piece of glass tube and another piece of copper wire of similar length toward the end of which was mounted an S-shaped

piece of metal. Such subassemblies are so arranged that they can fit together and enclose a germanium crystal or similar semiconductor and are used in the construction of various electronic circuits for controls, missiles, and so forth. The subassemblies were incorporated into products of Saegertown's customers, and were manufactured for the customers' special demands. The customers sold the products to distributors or retailers. On occasion, the customers sold at retail.

*Permit and Audit.* From June 19, 1961, to December 29, 1961, Saegertown held a sales tax permit and filed sales and use tax returns. No sales of tangible personal property for use or consumption by Saegertown's customers were shown on the books and no sales tax was assessed except that in question, on the single sale to Glass-Tite of all of the property.

## The Judgment

The conclusions of law made by the trial judge are these:

"1. The transaction in question, the exchange of plaintiff's stock for assets of the taxpayer, was not one of a series of sales sufficient in number, scope and character to constitute an activity requiring the taxpayer to hold a seller's permit.

"2. The sales by the taxpayer of the subassemblies in question did not constitute a business of selling tangible personal property of a kind the gross receipts from the retail sale of which are required to be included in the measure of a sales tax.

"3. The property transferred by the taxpayer to plaintiff in the subject transaction was never used by the taxpayer in the course of an activity for which the taxpayer was required to hold a seller's permit under the sales tax law.

"4. The taxpayer was not a 'retailer' within the meaning of Section 6015 and Section 6019 of the Revenue and Taxation Code or otherwise of the sales tax law.

"5. The taxpayer was not a 'seller' within the meaning of Section 6014 of the Revenue and Taxation Code or otherwise of the sales tax law.

"6. The transaction in question, the exchange of stock for business assets, was a sale of property not held or used by a seller in the course of an activity for which he is required to hold a seller's permit and was an occasional sale within the meaning of Section 6006.5(a) of the Revenue and Taxation Code and otherwise under the sales tax law.

"7. The transaction in question was exempt from sales tax."

If the single transaction constitutes an occasional sale, as the court decided it does, it is not taxable. ▉ Occasional sale is defined, so far as relevant to this case, as "A sale of property not held or used by a seller in the course of an activity for which he is required to hold a seller's permit, provided such sale is not one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit." (Rev. & Tax. Code, § 6006.5, subd. (a).) The essence of this intricate statute is that if there have been *sales* in a *series,* the precise number and quality of which are not defined, a particular sale may be taxable. It may be taxable even though the final sale is one of the entire business and all of its property. (*Market Street Ry. Co.* v. *California State Board of Equalization,* 137 Cal.App.2d 87 [290 P.2d 20]; *Sutter Packing Co.* v. *State Board of Equalization,* 139 Cal.App.2d 889 [294 P.2d 1083]; *Pacific Pipeline Constr. Co.* v. *State Board of Equalization,* 49 Cal.2d 729 [321 P.2d 729]; *U. S. Industries, Inc.* v. *State Board of Equalization,* 198 Cal.App.2d 775 [18 Cal.Rptr. 171].)

But in all of these cases, there had been other sales than the principal one. In the *Market Street Ry.* case, there had been some 900 separate retail sales of obsolete equipment, accommodation sales to employees and sales from the company's quarry. In *Sutter Packing Co.,* there had been several retail sales of used equipment during the three and one-half years preceding the sale of all of its equipment in May 1949, and these included ten retail sales in the last quarter of 1948 and one in the first quarter of 1949. In *Pacific Pipeline,* the machinery which was finally sold was the same sort of property in which the company dealt as a seller and there had been 19 separate sales in addition to the sale in question. In *U. S. Industries,* three separate corporations had sold their businesses to the taxpayer. One of them, Noslexa, a manufacturer of machine tools, had made hundreds of sales which were not for resale but were strictly retail, upon which sales taxes were paid; the same is true of the second company, Mostum, which manufactured and sold steel pipe; the third, Doncliff, which made and sold aircraft components and electronic devices, had made nine retail sales on which taxes were paid.

▉ Here, there was no retail sale except the one de-

scribed above. The sale, therefore, may be considered an occasional one provided there be satisfied the condition contained in section 6006.5, that the company be not required to hold a seller's permit. ▮ The company did hold such a permit, which is a factor to be considered. (*U. S. Industries, Inc.* v. *State Board of Equalization, supra,* at p. 788.) But the fact that the company actually held a permit is by no means conclusive that it was required to do so. There are penalties for not having a permit when one should have it. It is a misdemeanor for an officer of a corporation to engage in business as a seller without a permit. (Rev. & Tax. Code, § 6071.) Prudence would be on the side of holding the permit, when one considered the debatable nature of the questions presented in so many cases of taxability.

▮ We turn from the conclusion that the holding of a permit does not prove the necessity of holding one to the question whether the business carried on by Saegertown required that company to hold a permit. The inquiry sends us to two other statutes. Revenue and Taxation Code section 6066 requires a permit of every person desiring to engage in or conduct business as a seller within this state. Revenue and Taxation Code section 6014 defines ''seller'' thus: '' 'Seller' includes every person engaged in the business of selling tangible personal property *of a kind* the gross receipts from the retail sale of which are required to be included in the measure of the sales tax.'' (Italics added.) The words ''of a kind,'' which we have italicized, were added to the statute in 1949. (Stats. 1949, ch. 728, p. 1344.)

The interpretation of the statute, and in particular of the italicized words, will answer the question whether Saegertown was obliged by law to have a sales tax permit. Appellant contends that the purpose of the amendment was ''to provide assurance that all personal property which is not exempt from the sales tax would be subject to the tax prior to its ultimate consumption.'' We may accept this as a fair statement. But the property must be of such *kind* that escape from taxation might be effected if the permit were not required. Appellant would have it that the permit is required of everyone who sells anything, whether at retail or for resale, except items which are wholly exempt, such as, to give appellant's example, the services of a dry-cleaning establishment. Respondent argues that in order to be ''of a kind'' which is taxable, more is required than simply the qualities of either not being the

sale of a product (but of a service only), or being a sale which is within the exemptions expressly provided by statute. Respondent contends that there is an essential difference between (a) such goods as might be sold in their present state, either for resale or at retail (automobile tires are taken as an example, as given in Sato, *The Sales Tax and Capital Transactions,* 45 Cal.L.Rev. 450, 464), and (b) sales of articles such as subassemblies which are unsuited to retail sales.

We agree with repondent. Automobile tires, to follow the cited example (hundreds of others could be given), generally are *of a kind* of product which makes them readily saleable. The subassemblies are not. In the form in which they were produced by Saegertown, they were not usable. They had to be integrated into another product. They were made to the order of the manufacturers. Not once were they sold at retail in their original state. Appellant argues that someone might buy one in order to test it and not for resale. But this had never happened and the bare possibility that it could be done does not bring the product within the *kind* mentioned in section 6014. Also, appellant argues that there was no inherent barrier to the retail sale of one of these articles for the use of a purchaser in building an electronic instrument for his own use. But the subassemblies manufactured by Saegertown were all made to the particular order of the purchasers, and as they came into the hands of these purchasers they were as yet unusable.

Ruling No. 14 of the State Board of Equalization (18 Cal. Admin. Code, § 1924) reads as follows: "(b) Tax does not apply to sales of tangible personal property to persons who purchase it for the purpose of incorporating it into the manufactured article to be sold, as, for example, any raw material becoming an ingredient or component part of the manufactured article.'' All of the sales of Saegertown's products, therefore, were nontaxable. The administrative ruling is an additional reason for deciding that Saegertown was not a seller as defined in section 6014 and, therefore, that it needed no permit under section 6066. The administrative ruling was not changed by the board following the 1949 amendment to section 6014. The ruling has remained unaltered since January 1, 1945.

The single sale of the company's equipment was not one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's per-

mit. Therefore, it was an occasional sale within the meaning of section 6006.5 of Revenue and Taxation Code and was not taxable.

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.

A petition for a rehearing was denied November 21, 1968, and appellant's petition for a hearing by the Supreme Court was denied December 18, 1968.